# IN THE SUPREME COURT, STATE OF WYOMING

## 2022 WY 104

APRIL TERM, A.D. 2022

August 24, 2022

WPX ENERGY ROCKY MOUNTAIN, LLC,

Appellant
(Petitioner),

v.

WYOMING DEPARTMENT OF REVENUE,

Appellee
(Respondent).

WYOMING DEPARTMENT OF REVENUE,

Appellant
(Cross-Petitioner),

v.

WPX ENERGY ROCKY MOUNTAIN, LLC,

Appellee
(Cross-Respondent).

S-21-0269, S-21-0275

*W.R.A.P. 12.09(b) Certification*
*from the District Court of Campbell County*
*The Honorable Thomas W. Rumpke, Judge*

***Representing WPX Energy Rocky Mountain, LLC:***
 Walter F. Eggers III and Kasey J. Schlueter, Holland & Hart LLP, Cheyenne, Wyoming. Argument by Mr. Eggers.

*Representing Wyoming Department of Revenue:*
Bridget Hill, Attorney General; Brandi Monger, Deputy Attorney General; Karl D. Anderson, Supervising Attorney General; James Peters, Senior Assistant Attorney General. Argument by Mr. Peters.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BOOMGAARDEN, Justice.**

[¶1]     These consolidated appeals concern whether and to what extent WPX Energy Rocky Mountain, LLC (WPX) is entitled to deduct a certain type of expense known as a "reservation fee" under the "netback" severance tax valuation method, Wyo. Stat. Ann. § 39-14-203(b)(vi)(C) (LexisNexis 2021), for natural gas production years 2013–2015. The Wyoming Board of Equalization (Board) concluded WPX was entitled to deduct some of its reservation fees.  WPX and the Wyoming Department of Revenue (DOR) each petitioned the district court for review.  The district court certified the cases to us pursuant to W.R.A.P. 12.09(b).  We affirm the Board's decision in part and reverse in part.

## ISSUES

[¶2]     In S-21-0275, the DOR presents one issue, which we restate as:

> Does the netback valuation method allow WPX to deduct only the portion of its reservation fees that is directly tied to the volume of gas it shipped on each pipeline?

[¶3]     In S-21-0269, WPX presents two issues, which we restate as:

> I. Did the Board misinterpret the netback statute when it concluded WPX was not entitled to deduct its Bison Pipeline reservation fees for months when it shipped no gas?

> II. Did the Board incorrectly conclude the netback statute precludes WPX from deducting any portion of its Bison Pipeline reservation fees the pipeline company used to recoup its pipeline construction costs?

## BACKGROUND

[¶4]     For many years, WPX produced natural gas from wells in the Powder River Basin. To transport this gas to various markets for sale, WPX's affiliate, WPX Marketing, entered into long-term, firm transportation service agreements[1] with Bison Pipeline, LLC and Fort Union Gas Gathering, LLC.[2]

---

[1] "Interruptible service" is an alternative to firm transportation service.  As the name suggests, interruptible service may be interrupted to ship gas for any company with a higher reservation priority on the pipeline. Under an interruptible service agreement, the contracting party pays only a commodity charge based on the volume of gas shipped.  Interruptible service is cheaper than firm transportation service, but less reliable.

[2] Our discussion of these agreements is limited because they are confidential.  Though WPX Marketing's predecessor entered into the agreements, we refer to the contracting party as WPX Marketing for ease of reference.

[¶5]    WPX Marketing paid two types of charges under these agreements.  First, it paid a monthly "demand charge"—also known as a "reservation fee"—to reserve a certain amount of capacity on the pipeline each month.  Then, if WPX-produced gas shipped on the pipeline, WPX Marketing paid an additional "commodity charge" based on the volume shipped.  Each month, the pipeline companies invoiced WPX Marketing, which paid the respective fees and charges, and then passed those fees and charges along to WPX.  WPX paid the full reservation fee for each pipeline regardless of whether or how much gas it shipped on the respective pipeline in any given month.  During production years 2013–2015, there were 24 months when WPX shipped no gas on the Bison Pipeline.  Other months WPX shipped some gas, but less than its reserve capacity, on each pipeline.

[¶6]    Wyoming law "levie[s] a severance tax on the value of the gross product extracted for the privilege of severing or extracting crude oil, lease condensate or natural gas in the state."  Wyo. Stat. Ann. § 39-14-203(a)(i).  This severance tax raises revenue that is intended to offset the social and economic impacts mineral development imposes on state and local communities.  *Amoco Prod. Co. v. State*, 751 P.2d 379, 384 (Wyo. 1988).  The DOR is responsible for collecting severance taxes.  Wyo. Stat. Ann. § 39-14-202(a)(i) (LexisNexis 2021); *see also* Wyo. Stat. Ann. § 39-11-102(c) (LexisNexis 2021).

[¶7]    To calculate the taxable value of natural gas for severance tax purposes, the DOR must determine the statutory valuation method to be used where oil and gas production "is not sold at or prior to the point of valuation by bona fide arms-length sale[]" or where it "is used without sale[.]"  Wyo. Stat. Ann. § 39-14-203(b)(vi).  One applicable method is the netback valuation method.  Wyo. Stat. Ann. § 39-14-203(b)(vi)(C).  This method provides that "[t]he fair market value is the sales price minus expenses incurred by the producer for transporting produced minerals to the point of sale and third party processing fees."  *Id.* The netback method was used to value WPX's production for 2013–2015.

[¶8]    When WPX reported its taxable value for production years 2013–2015, it fully deducted its reservation fees as transportation expenses.  In August 2017, the Wyoming Department of Audit (DOA) began auditing WPX's reported taxable value for those years.

[¶9]    In December 2017, four months into the audit, the Board issued a decision on the deductibility of WPX's reservation fees under the netback statute for production year 2012.  As explained in the decision, WPX initially filed returns partially deducting its reservation fees, but then amended its returns to fully deduct them.  The DOR rejected the amended returns on grounds that WPX could deduct only the portion of its reservation fees tied to the pipeline capacity it actually used.  The Board held WPX was entitled to fully deduct its reservation fees as transportation expenses under the netback method for production year 2012.  It reasoned that, "[r]ead *in pari materia*, the [l]egislature used 'expenses,' 'transporting,' and 'produced' in a generic, inclusive manner relative to the taxation of natural gas.  The [l]egislature did not specify, imply, or even suggest how non-unit based

pipeline fees might be apportioned for deductibility purposes, if at all." The DOR did not petition the district court for review.

[¶10]   At the end of the DOA's audit of production years 2013–2015, notwithstanding the Board's 2017 decision, the DOA did not allow WPX to fully deduct its reservation fees. It was concerned that WPX shipped no gas on the Bison Pipeline in certain months and shipped less than its reserve capacity on both pipelines in other months. Based on the audit, the DOR notified WPX it owed $2,629,015.92 in additional severance taxes plus interest.[3] WPX appealed to the Board.

[¶11]   In the contested case proceedings, WPX contended the DOR's audit assessment was inconsistent with the Board's 2017 decision and argued that, under the netback statute's plain language, its reservation fees were fully deductible regardless of whether or how much gas it shipped each month. WPX's manager of state tax and royalty reporting testified that WPX fully deducted its reservation fees because it incurred and paid them to move its gas out of the Powder River Basin.

[¶12]   The DOR maintained the same position as in the prior proceedings: WPX was entitled to deduct only the portion of its reservation fees corresponding to the actual volume of gas it shipped each month. It asserted the Board's 2017 decision was not binding for various reasons, including because the facts were not fully developed in the prior proceedings.

[¶13]   In its 2021 decision, the Board reached three conclusions relevant to this appeal.[4] First, WPX was entitled to deduct its pipeline reservation fees for months when it transported some but less than its reserve capacity on each pipeline. Second, WPX was not entitled to deduct any of its Bison Pipeline reservation fees for months when it shipped no gas on the pipeline. Third, for months when WPX shipped some gas on the Bison Pipeline, it could not deduct any portion of its reservation fees the pipeline company used to recoup pipeline construction costs.

---

[3] The DOR withdrew its assessment of interest at the contested case hearing.

[4] The Board acknowledged WPX's appeal involved the same issue addressed in the prior appeal. But it also noted the appeal raised a new question—whether WPX was entitled to deduct its Bison Pipeline reservation fees for months when it shipped no gas on the Bison Pipeline—and the DOR had provided additional information to evaluate the deductibility of firm reservation fees for 2013–2015. The Board concluded its prior decision had no preclusive effect on either issue "[b]ecause each tax year's mineral tax liability stands on its own[.]" On appeal, WPX insists the Board's 2017 interpretation of the netback statute is correct but does not argue the Board was bound by its earlier decision. Nor are we bound. *Cf. Union Tel. Co. v. Wyo. Pub. Serv. Comm'n*, 2022 WY 55, ¶ 22 n.8, 508 P.3d 1078, 1088 n.8 (Wyo. 2022) ("Union also discusses the doctrine of res judicata and asserts that the [Public Service Commission's] 2018 ruling was legal precedent, thus alluding to the doctrine of stare decisis. Because Union does not present cogent argument or citation to authority supporting the application of either of these doctrines, we decline to address them." (citations omitted)).

[¶14] WPX and the DOR each petitioned the district court for review of the Board's decision. The district court consolidated the cases and certified them to this Court pursuant to W.R.A.P. 12.09(b). On appeal, the parties disagree on when reservation fees are deductible as transportation expenses under the netback statute for months when WPX (1) shipped some gas, but less than its reserve capacity, on each pipeline, (2) shipped no gas on the Bison Pipeline, and (3) shipped some gas on the Bison Pipeline and deducted reservation fees attributable in part to pipeline construction costs.

## STANDARD OF REVIEW

[¶15] The Wyoming Administrative Procedure Act, Wyo. Stat. Ann. § 16-3-114(c) (LexisNexis 2021), governs our review of the Board's decision. *Exaro Energy III, LLC v. Wyo. Oil & Gas Conservation Comm'n*, 2020 WY 8, ¶ 9, 455 P.3d 1243, 1248 (Wyo. 2020) ("When an agency's decision is certified to this Court under W.R.A.P. 12.09, 'we apply the standards for judicial review set forth in Wyo. Stat. Ann. § 16-3-114(c)[.]'" (quoting *Wyodak Res. Dev. Corp. v. Wyo. Dep't of Revenue*, 2017 WY 6, ¶ 14, 387 P.3d 725, 729 (Wyo. 2017))); *Delcon Partners LLC v. Wyo. Dep't of Revenue*, 2019 WY 106, ¶ 7, 450 P.3d 682, 684 (Wyo. 2019). Ordinarily, we would review the Board's factual findings for substantial evidence. *Wyodak*, ¶ 14, 387 P.3d at 729 (citations omitted). In this case, however, the underlying facts are largely undisputed, and the crux of the dispute requires us to interpret the netback valuation statute, which is a matter of law subject to de novo review.[5] *Id.* ¶ 15, 387 P.3d at 730 (citation omitted); *Delcon*, ¶ 7, 450 P.3d at 684 (citation omitted). We likewise review the Board's conclusions of law de novo, affirming them when they are in accordance with law and correcting them when they are not. *Wyodak*, ¶ 15, 387 P.3d at 730 (citation omitted).

[¶16] Our goal when interpreting a statute is "to give effect to the legislature's intent." *Holding v. Luckinbill*, 2022 WY 10, ¶ 13, 503 P.3d 12, 17 (Wyo. 2022) (citing *Life Care Ctr. of Casper v. Barrett*, 2020 WY 57, ¶ 16, 462 P.3d 894, 898 (Wyo. 2020)). To determine the legislature's intent we look first "to the plain language of the words in the statute[.]" *Id.* (citing *Life Care*, ¶ 16, 462 P.3d at 898); *see also Delcon*, ¶ 9, 450 P.3d at 685 ("The best evidence of the legislature's intent is the plain and ordinary meaning of the words used in the statute." (citations omitted)). "We give effect to the most likely, most reasonable, interpretation of the statute, given its design and purpose." *Holding*, ¶ 13, 503 P.3d at 17 (internal quotations omitted) (quoting *Life Care*, ¶ 16, 462 P.3d at 898–99).

> We therefore construe each statutory provision *in pari materia*, giving effect to every word, clause, and sentence according to their arrangement and connection. To ascertain the meaning of a given law, we also consider all statutes relating to the same subject or having the same general purpose and strive to

---

[5] The DOR has not prescribed by rule how taxpayers are to deduct transportation expenses under this statute.

interpret them harmoniously. We presume that the legislature has acted in a thoughtful and rational manner with full knowledge of existing law, and that it intended new statutory provisions to be read in harmony with existing law and as part of an overall and uniform system of jurisprudence. When the words used convey a specific and obvious meaning, we need not go farther and engage in statutory construction.

*Id.* (quoting *Life Care*, ¶ 16, 462 P.3d at 899).

## *DISCUSSION*

[¶17]   The statutory netback valuation method reads as follows:

(vi) In the event the crude oil, lease condensate or natural gas production as provided by paragraphs (iii) and (iv) of this subsection is not sold at or prior to the point of valuation by bona fide arms-length sale, or, except as otherwise provided, if the production is used without sale, the department shall identify the method it intends to apply under this paragraph to determine the fair market value and notify the taxpayer of that method on or before September 1 of the year preceding the year for which the method shall be employed. The department shall determine the fair market value by application of one (1) of the following methods:

. . . .

(C) Netback--The fair market value is the sales price minus expenses incurred by the producer for transporting produced minerals to the point of sale and third party processing fees. The netback method shall not be utilized in determining the taxable value of natural gas which is processed by the producer of the natural gas[.]

Wyo. Stat. Ann. § 39-14-203(b)(vi)(C).[6]

---

[6] There is no dispute the netback method applied to production years 2013–2015 and remained the same during all periods relevant to this appeal. *See* 1999 Wyo. Sess. Laws, ch. 10, § 1 (last amending the netback statute to replace the phrase "cash market value" with "market value"). Nor is there any dispute WPX incurred its reservation fees after the point of valuation, as required by § 39-14-203(b)(ii), paid the entire reservation fee regardless of how many units of gas it transported in a month, was a producer, and the natural gas it produced constituted "produced minerals."

[¶18] Neither party argues the netback statute is ambiguous. The parties simply interpret the operative language—"expenses incurred by [WPX] for transporting [natural gas produced from the Powder River Basin] to the point of sale"—differently. *Wyodak*, ¶ 25, 387 P.3d at 732 ("The fact that the parties have differing opinions on the statute's meaning is not conclusive as to ambiguity." (citation omitted)).

[¶19] The DOR interprets the operative language narrowly, asserting it allows a producer to deduct only the portion of its reservation fees that directly corresponds to the volume of gas it shipped down the pipeline in any given month. In other words, when WPX used 100% of its reserve capacity in a month, it could deduct its entire reservation fee for that month. But when WPX used less than 100% of its reserve capacity in a month, it could only deduct a portion of its reservation fee based on the units, or volume of gas it shipped on the pipeline. And when WPX transported no gas on the pipeline in a month, it could not deduct any portion of its reservation fee for that month.

[¶20] WPX interprets the operative language broadly, contending its reservation fees are fully deductible regardless of whether or how much gas it transported on the respective pipelines. To support its position, WPX generally insists the Board correctly interpreted the plain language of the statute in its 2017 decision, *see supra* ¶ 9, and strayed from the plain language in its 2021 decision.[7]

[¶21] Wyo. Stat. Ann. § 39-14-203(b)(vi)(C) certainly is unambiguous in that reservation fees are deductible if they are "expenses incurred by the producer for transporting produced minerals to the point of sale[.]" The more difficult question, absent further statutory definition, is the extent to which, if any, the legislature intended to impose a unit-based limit on this operative language such that WPX can only deduct those expenses specifically tied to the volume of gas WPX actually transported on each pipeline, each month. On considering that question and the mineral taxation statutes *in pari materia*, we, like the Board, conclude the operative language is unambiguous in its plain meaning and application, that the DOR's unit-based application is not supported by the operative language, and that WPX's reading of the statute to allow a deduction where no gas flowed down the pipeline is overbroad and contrary to how fair market value is calculated under the statute. We disagree with the Board, however, in that we interpret the netback valuation statute to allow WPX to deduct its Bison Pipeline reservation fees even if the pipeline company uses some portion to recoup its construction costs, so long as WPX transported some gas down the Bison Pipeline.

---

[7] By interpreting both the Board's 2017 decision and netback valuation statute as broadly as possible, WPX characterizes any limits the Board put on deductibility as impermissible "exceptions" to the statute. We disagree with WPX's characterization because, as explained *infra* ¶¶ 31–34, the plain and ordinary meaning of the statute is not as broad as WPX asserts.

**A. The statute's plain language allows WPX to fully deduct its pipeline reservation fees for months when some but less than the full reserve capacity of gas was transported on that pipeline.**

[¶22] As noted above, the netback valuation statute clearly allows the deduction of reservation fees when those fees are "expenses incurred by the producer for transporting produced minerals to the point of sale[.]" Wyo. Stat. Ann. § 39-14-203(b)(vi)(C). The legislature did not define "expenses," but the word "expense" commonly means "something expended to secure a benefit or bring about a result"; a "financial burden or outlay: cost"; and "an item of business outlay chargeable against revenue for a specific period[.]" *Merriam-Webster's Collegiate Dictionary* 440 (11th ed. 2014); *see also Merriam-Webster Dictionary* 172 (2005) ("expense" means an "expenditure" or "cost"). Applying this ordinary meaning, we conclude any WPX expenditure or consideration exchanged for a gas transportation service constitutes an "expense." *See Painter v. Hallingbye*, 2021 WY 78, ¶ 27, 489 P.3d 684, 693 (Wyo. 2021) ("When a term is undefined in a statute, this Court supplies an ordinary and obvious definition." (citation omitted)). We find nothing in the operative language of the netback valuation statute to suggest the legislature intended to limit qualified expenses to only those expenditures tied to certain quantities of gas or full utilization of the transportation service (e.g., full use of the reserved pipeline capacity).

[¶23] The legislature also did not define "transporting," "transport," or "transportation." As commonly used, to "transport" is "to transfer or convey from one place to another[.]" *Merriam-Webster's Collegiate Dictionary* 1330 (11th ed. 2014); *see also Merriam-Webster Dictionary* 522 (2005) ("transport" means "to convey from one place to another"). Similarly, as used in the industry, "'[t]ransportation' involves the movement of gas through a pipeline's principal transmission system." Williams & Meyers, *Manual of Oil & Gas Terms* 1082 (15th ed. 2012) (citation omitted). And "[t]ransportation costs" are "[t]he costs of transporting oil or gas to a market." *Id.* None of these definitions impose a quantitative threshold on the volume of gas being transported.

[¶24] Elsewhere in the mineral taxation statutes, the legislature uses "transport," "transporting," and "transportation" inclusively to refer to both the thing being moved— i.e., natural gas—and the operation of equipment necessary to move the gas—i.e., compressors and other pipeline "system" components. *See, e.g.*, Wyo. Stat. Ann. §§ 39-14-201(a)(v) (LexisNexis 2021) (defining "[c]ompressor" as "a device associated with processing or transporting natural gas which mechanically increases the pressure of natural gas"); 39-14-201 (defining "[g]athering" as "the transportation of . . . natural gas from multiple wells by separate and individual pipelines to a central point of accumulation, dehydration, compression, separation, heating and treating or storage"). In other words, the legislature reasonably acknowledged that both go hand in hand, and so long as gas and a pipeline system are present, transportation occurs. Nowhere did the legislature use these terms in a manner that required full utilization of the system necessary to move the gas

from point A to point B. Thus, we conclude the legislature intended the netback valuation statute to allow producers to fully deduct their pipeline reservation fees so long as they move some gas on the pipeline system.

[¶25] The DOR's arguments do not convince us otherwise. Absent any restrictive statutory language to support its argument that only those reservation fees that are "necessarily linked" or "directly tied" to actual transportation qualify for deduction, the DOR would have to show the transportation agreements required such linkage. However, the evidence reflected that, under the respective agreements, WPX had to pay the monthly reservation fee regardless of how much gas it transported in a given month. Unlike commodity charges, reservation fees did not fluctuate based on the quantity of gas WPX transported down the respective pipeline. If the contractual language does not define the reservation fee as a unit-based fee, we will not redefine or recalculate the reservation fee to make it appear so. Rather, the statutory language must control. As shown, the statutory language imposes no quantitative or capacity-based restrictions. We cannot and will not impose limits the language does not support. *See Miller v. Life Care Centers of Am., Inc.*, 2020 WY 155, ¶ 26, 478 P.3d 164, 171 (Wyo. 2020) ("A statute is not interpreted in a way that . . . adds language to it." (citation omitted)); *WyoLaw, LLC v. Off. of Att'y Gen., Consumer Prot. Unit*, 2021 WY 61, ¶ 20, 486 P.3d 964, 970 (Wyo. 2021) (declining to read a restriction into the statute that the plain language did not support).

[¶26] The DOR also argues that allowing WPX to fully deduct its reservation fees when it only used some of its reserve capacity may lead to absurd results in that WPX may be able to deduct its "entire reservation fee against such a small quantity of gas that the taxable value of that gas could be zero or a negative value." That may be. But we rejected a similar argument when applying the proportionate profits method in *RME Petroleum Co.*, explaining that if low tax values resulted from our interpretation of the statute, that was a matter for the legislature. *RME Petroleum Co. v. Wyo. Dep't of Revenue*, 2007 WY 16, ¶ 52, 150 P.3d 673, 691 (Wyo. 2007). The same is true here. Any perceived defect in the netback method must be taken up with the legislature. *Delcon*, ¶ 10, 450 P.3d at 685.

[¶27] Finally, the DOR argues we would have to impermissibly add words to the statute for WPX to fully deduct its reservation fees for months when it transported less than its reserve capacity on that pipeline. It asserts the statute would have to read: "expenses incurred [for the ability to transport] produced minerals to the point of sale." As explained above, however, the plain and ordinary meaning of "transporting" includes the thing being transported and the equipment necessary to move it. The legislature thus incorporated the ability to transport in the statutory language it used. No additional language is needed to support this plain and ordinary interpretation.

[¶28] The outward appeal of the DOR's interpretation is grounded more in policy than the statute's plain language, design, or purpose. We understand that by imposing a commodity, or unit-based, limitation on the netback valuation method, the DOR could better optimize

severance tax revenues and protect State coffers in a low market price environment. However, Wyoming's severance tax statute is not designed to optimize State revenue, but rather to determine the fair market value of minerals severed and sold. *See RME Petroleum Co.*, ¶¶ 51–52, 150 P.3d at 691 (noting "we have cautioned the Board to avoid making decisions based upon the tax revenue to be generated for the State" and rejecting the DOR's concern that our interpretation of the proportionate profits method would result in low tax values, as "[b]y enacting [the proportionate profits statute], the legislature ha[d] declared what fair market value of oil and gas production shall be").

[¶29] "[O]ur role [] is not to determine whether the legislature's chosen policy is the best one; it is to give effect to the one it chose." *Delcon*, ¶ 9, 450 P.3d at 685. As explained above, nothing in the operative language requires transportation expenses be determined per unit of gas transported or allocated based on the percentage of reserve capacity used. The legislature instead chose general language. Had it intended to limit transportation expense deductions, it knew how to do so. *See* Wyo. Stat. Ann. §§ 39-14-203(b)(xi) ("For natural gas, the total of all actual transportation costs from the point where the production process is completed to the inlet of the processing facility or main transmission line shall not exceed fifty percent (50%) of the value of the gross product without approval of the department[.]"); 39-14-203(b)(vi)(E)(I) (stating that, under the modified netback valuation method, the fair market value is "[t]he total amount received from the sale of the natural gas minus the total direct processing and transportation costs, any arms-length transportation fees from the point of valuation to the point of arms-length sale, overhead costs directly related to facility operations not to exceed ten percent (10%) of the total direct processing and transportation costs, exempt royalties and return on investment incurred by the taxpayer from the point of valuation to the point of arms-length sale").

[¶30] For all these reasons, the Board's conclusion that WPX may deduct its pipeline reservation fees for months when it transported some but less than its reserve capacity of gas is in accordance with law. We therefore affirm on this issue.

### B. Under the plain language of the statute, WPX may not deduct its Bison Pipeline reservation fees for months when it shipped no gas on the Bison Pipeline.

[¶31] Because the legislature clearly intended that transportation occurs when both the thing being transported and the equipment necessary to move it are present, see *supra* ¶ 24, we easily conclude the operative language in the netback valuation statute prohibits WPX from deducting its reservation fees as expenses incurred for transporting natural gas in months when one of those transportation components—the gas—is missing.

[¶32] WPX ignores this reasonable pairing, and its argument further misses the mark in that, for months when it transported no gas on the Bison Pipeline, there was no "sales price"—the starting point for determining fair market value—and no "point of sale"—the

express transportation endpoint the legislature identified in the netback valuation statute. Wyo. Stat. Ann. § 39-14-203(b)(vi)(C). A producer may only subtract from the sales price those transportation expenses incurred in moving gas to the point of sale. *Id.*

[¶33] For months when WPX transported no gas on the Bison Pipeline, there was no "sales price" valuation starting point and no movement of gas from point A to point B, "the point of sale." With nothing to value during those months, WPX's purported transportation costs by way of its reservation fees are theoretical at best. Wyoming mineral tax law does not accommodate deduction of theoretical or contrived costs. *See, e.g.*, *Wyodak*, ¶ 46, 387 P.3d at 736 (agreeing with the Board that "[t]he current statutory valuation methods do not envision hypothetical points of valuation or costs"); *see also State, Dep't of Revenue v. Amoco Prod. Co.*, 7 P.3d 35, 39 (Wyo. 2000) (noting "[t]he net-back method arrives at fair cash market value at the point of valuation by subtracting the 'value' added to the product by processing and transportation from the gross sales price of the product" (citation omitted)). Nor does the language in the netback valuation statute support a generic, universal deduction of costs, such as costs to transport gas from Wyoming, or another geographical region such as the Powder River Basin. Had the legislature intended a broader, nonspecific deduction, or had it intended to allow deduction of all expenses, it could simply have taxed the producer's profit.

[¶34] For these reasons, the Board's conclusion that WPX's Bison Pipeline reservation fees are not deductible for those months when it transported no gas on the Bison Pipeline is in accordance with law. We therefore affirm on this issue.

### C. The Board's conclusion that WPX cannot deduct any portion of its Bison Pipeline reservation fees the pipeline company used to recoup pipeline construction costs is contrary to the statute's plain language and the integrated nature of reservation fees under the Bison agreement.

[¶35] Though the Board appropriately gave effect to the legislature's intent to allow deduction of non-unit-based costs in the form of reservation fees, it inexplicably read a limitation into the broad netback valuation language to support its premise that if the pipeline company uses any portion of the reservation fee to recoup pipeline construction costs the producer may not deduct that portion of its fee. We conclude the plain language of the statute refutes that premise, and the integrated nature of WPX's Bison Pipeline reservation fees bolsters our conclusion.

[¶36] On this issue, we first return to the fact, as explained above, that in crafting the netback valuation provision, the legislature did not expressly limit or otherwise condition which transportation expenses are deductible, so long as the producer incurs those expenses as a result of transporting some gas on a pipeline system in a given month. The language is broad and, again, reflects the legislature's recognition that transportation includes two components—the gas being transported and equipment necessary to transport it. Without

10

evidence of legislative intent to the contrary, such as further statutory definition or language expressly limiting transportation expenses to units of gas transported or non-construction-related pipeline system costs, neither the Board nor we are at liberty to add restrictive language.

[¶37]  The mistake in the Board's premise that expenses cannot include any portion of the reservation fee the pipeline company may use to recoup its construction costs is made even more obvious by evidence the Board admitted in the current proceedings establishing the integrated nature of WPX's Bison Pipeline reservation fees.  To be clear, construction costs were not a separate fee under the Bison agreement.  Nor did the Bison agreement include any breakdown of costs subsumed within the negotiated reservation fee.  Indeed, the Board recognized as much when it tried to "unbundle" "construction costs" from "transportation expenses" and had difficulty doing so.

[¶38]  In her expert report, WPX expert Kris Terry clearly explained how fees charged under firm transportation agreements are directly linked and integral to the construction and financial viability of pipelines, particularly around the development stage:

> All pipeline projects submitted for [Federal Energy Regulatory Commission (FERC)]-approval must demonstrate that they are financially viable projects.  The FERC looks to the party proposing the pipeline project to establish that the pipeline has firm transportation contract commitments at rates that will permit the pipeline company to pay for the pipeline system over a reasonable period of time, depending upon the cost and the proposed capacity.
>
> . . . .
>
> The demand charges largely pay for the construction and operation of new interstate pipeline systems, and without them the projects would not have been approved by the FERC.

[¶39]  Ms. Terry also summarized the circumstances leading to construction of the Bison Pipeline.  From 2000 to 2005, WPX and other producers began increasing production in the Powder River Basin.  By 2006, it was plain the existing Fort Union Pipeline would be inadequate to transport the increased production to market.  Northern Border, which transported gas from the Canadian border to Ventura, Iowa, proposed building the Bison Pipeline. The Bison Pipeline would receive gas in the Powder River Basin and transport it to the existing Northern Border transmission pipeline, allowing producers in the Powder River Basin to access an additional market.

[¶40]  Ms. Terry testified that

> [b]ut for companies like WPX and the other companies who made those initial firm commitments to the Bison pipeline, it would not have been built.  In other words, you cannot get financing to build these long-distance major transmission lines without commitments from a base number of shippers.  So, in other words, today you can say, well, there's interruptible capacity on Bison, anybody can transport on Bison.  Well, that's only true because somebody took the risk initially to make commitments and then the pipeline companies took the risk of making the investment and building the system.

[¶41]  The Bison Pipeline reservation fee was unquestionably a "negotiated reservation rate" under the plain terms of the Bison agreement.  WPX incurred the fee to ship gas on the Bison Pipeline for production years 2013–2015.  That the pipeline company used some portion of the reservation fee to recoup pipeline construction costs does not disqualify it from deduction as a transportation expense under the netback statute.  Absent the reservation fee there would have been no pipeline system—one of the two components necessary for "transportation" to occur.

[¶42]  The Board's remaining concerns do not convince us otherwise.  It simply does not matter that WPX Marketing, rather than WPX, entered into the underlying agreement with the pipeline company, as the reservation fees were passed on to WPX in their entirety.  That WPX Marketing was required to pay certain fees even if the agreement terminated is also immaterial, as WPX would then ship no gas on the pipeline and, for the reasons explained above, would be allowed no deduction.  We likewise see no reason why it matters that the reservation fee was reduced at one point or that reservation fees negotiated for the newer Bison Pipeline were much higher than concurrent reservation fees negotiated for the much older Fort Union Pipeline.  Perhaps these facts support the Board's conclusion that the pipeline company used a portion of the negotiated reservation fees to recoup some of its pipeline construction costs, but they do not limit the legislature's broad, inclusive use of the term "expense" to include any expenditure or consideration WPX exchanged for a gas transportation service and its use of the term "transporting" to require both the gas and the pipeline system.

[¶43]  Accordingly, the Board's decision that WPX could not deduct any portion of its Bison Pipeline reservation fees the pipeline company used to recoup pipeline construction costs is not in accordance with law.  We reverse the Board on this issue.

## CONCLUSION

[¶44]   The netback statute reflects the legislature's recognition that transportation includes two components—the gas being transported and the equipment necessary to transport it. By using the terms "expenses" and "transporting" broadly, to include both components, we conclude the legislature intended the netback valuation statute to allow producers to fully deduct their pipeline reservation fees so long as they moved some gas on the pipeline system. The statutory language imposes no quantitative or capacity-based restrictions. Nor does it expressly limit or otherwise condition which transportation expenses are deductible.

[¶45]   We therefore affirm the Board's decision that WPX may deduct its pipeline reservation fees for months when it transported some but less than its reserve capacity of gas on each pipeline. We also affirm the Board's conclusion that WPX's Bison Pipeline reservation fees are not deductible for those months when it transported no gas on the Bison Pipeline. However, we reverse the Board's decision that WPX could not deduct any portion of its Bison Pipeline reservation fees the pipeline company used to recoup pipeline construction costs, and we remand for the DOR to issue a new assessment of WPX's 2013–2015 production.