# IN THE SUPREME COURT, STATE OF WYOMING

## 2023 WY 87

### APRIL TERM, A.D. 2023

### August 29, 2023

JONAH ENERGY LLC, a Delaware
limited liability company,

Appellant
(Petitioner),

v.                                                          S-22-0271

WYOMING DEPARTMENT OF
REVENUE,

Appellee
(Respondent).

*Appeal from the District Court of Sublette County*
The Honorable Marvin L. Tyler, Judge

*Representing Appellant/Petitioner:*
Randall B. Reed, Long Reimer Winegar LLP, Cheyenne, Wyoming; Judith M. Matlock, Davis, Graham & Stubbs, LLP, Denver, Colorado. Argument by Ms. Matlock.

*Representing Appellee/Respondent:*
Bridget Hill, Wyoming Attorney General; Brandi Monger, Deputy Attorney General; Karl D. Anderson, Supervising Attorney General; James Peters, Senior Assistant Attorney General. Argument by Mr. Anderson.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, FENN, JJ, and CAMPBELL, DJ.*

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.

**KAUTZ, Justice.**

[¶1]    Jonah Energy LLC (Jonah) appeals from the Board of Equalization's (Board) decision which upheld the Department of Revenue's (DOR) final determinations increasing the taxable value of Jonah's natural gas liquids (NGL) production for 2014 through 2016.  Jonah challenges the Board's refusal to account for deficiency fees it paid the purchaser of its NGL, Enterprise Products Operating LLC (Enterprise Products), in determining the NGL's taxable value.  We affirm the Board's decision.

## ISSUES

[¶2]    The issues on appeal are:

1. Did the Board misinterpret the NGL Purchase Agreement (Purchase Agreement) between Jonah and Enterprise Products?

2. Did the Board err by failing to take the facts and circumstances surrounding execution of the Purchase Agreement into account when interpreting it?

## FACTS

[¶3]    Jonah sold NGL it produced from gas wells in Sublette County to Enterprise Products under the terms of the Purchase Agreement, which provides definitions necessary to understand the facts and issues in this case.  Gas from wells operating prior to June 1, 2012, was classified in the Purchase Agreement as "Base Production"; gas from wells that began producing after that date was classified as "New Production."  The gas was transported from Jonah's wellheads to the Pioneer Gas Processing Plant (Pioneer Plant) in Lincoln County owned by Enterprise Gas Processing, LLC (Enterprise Processing).  At the Pioneer Plant, the gas was processed by separating it into NGL[1] and residue gas.  Enterprise Products purchased Jonah's New Production NGL, which we will refer to as "New Production," at the "upstream side of the flange connection between the MAPL Pipeline and the Pioneer Plant," i.e., the outlet of the Pioneer Plant.[2]  The Purchase Agreement established a price for the New Production at the outlet of the Pioneer Plant.  Enterprise Products then transported the New Production on the Mid-America Pipeline (MAPL) to its fractionation plant in Mont Belvieu, Texas.  The Purchase Agreement authorized Enterprise Products to separately charge Jonah a Shortfall Capacity Deficiency Fee if Jonah did not provide enough New Production to fully utilize Enterprise Product's capacity on

---

[1] NGL and New Production are also referred to as "Raw Make" in the Purchase Agreement.  For the sake of clarity, we will use the terms NGL and New Production, as appropriate.

[2] In the Purchase Agreement, the outlet of the Pioneer Plant is also called the "Raw Make Delivery Point," but we will refer to it as the outlet of the Pioneer Plant.

the MAPL. At the fractionation plant, the New Production was "fractionated" (separated) into various components which could be sold commercially, such as ethane, butane, propane, and gasoline.

[¶4] Jonah reported the taxable value of its Sublette County gas production to the DOR using the Netback valuation method authorized by Wyo. Stat. Ann. § 39-14-203(b)(vi)(C) (LexisNexis 2023) ("The fair market value [of the gas] is the sales price minus expenses incurred by the producer for transporting produced minerals to the point of sale and third party processing fees."). In 2020, the Department of Audit reviewed Jonah's tax returns for 2014 through 2016 and determined the taxable value of the New Production was higher than reported because Jonah had incorrectly deducted the Shortfall Capacity Deficiency Fee in calculating the sales price. The DOR adopted the audit findings and issued final determinations to Jonah assessing additional severance taxes on its New Production for 2014 through 2016 and increasing the taxable value for ad valorem tax purposes. Jonah appealed the final determinations to the Board, claiming the DOR had improperly calculated the taxable value of its New Production.

[¶5] The Board held a contested case hearing on the discrete issue of whether the DOR erroneously prohibited Jonah from deducting the Shortfall Capacity Deficiency Fee in calculating the sales price for its New Production. The Board concluded the DOR had correctly determined Jonah was not entitled to the deduction and affirmed the DOR's valuation. Jonah filed a petition for review of the Board's decision with the district court. Jonah and the DOR filed a joint motion asking the district court to certify the case directly to this Court under Wyoming Rule of Appellate Procedure (W.R.A.P.) 12.09(b) because it presented a question of state-wide impact and certification would serve the interests of judicial economy and reduce the parties' litigation expenses. *See* W.R.A.P. 12.09(b)(3), (6). The district court issued an order certifying the case and we accepted it. *See* W.R.A.P. 12.09(c)-(d).

**STANDARD OF REVIEW**

[¶6] "When an administrative agency case is certified to this Court under W.R.A.P. 12.09(b), we apply the standards for judicial review set forth in Wyo. Stat. Ann. § 16-3-114(c)." *Wyodak Res. Dev. Corp. v. Dep't of Revenue,* 2017 WY 6, ¶ 14, 387 P.3d 725, 729 (Wyo. 2017) (citing *Wyodak Res. Dev. Corp. v. Dep't of Revenue,* 2002 WY 181, ¶ 9, 60 P.3d 129, 134 (Wyo. 2002)). The agency's findings of fact after a contested case hearing are reviewed using the substantial evidence standard. *Id.* (citing § 16-3-114(c), and *Dale v. S & S Builders, LLC,* 2008 WY 84, ¶ 22, 188 P.3d 554, 561 (Wyo. 2008)). "'Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Genner v. State ex rel. Dep't of Workforce Servs., Workers' Comp. Div.,* 2022 WY 123, ¶ 13, 517 P.3d 1138, 1142 (Wyo. 2022) (quoting *Guerrero v. State ex rel. Dep't of Workforce Servs., Workers' Comp. Div.,* 2015 WY 88, ¶ 12, 352 P.3d 262, 266 (Wyo. 2015)) (other citation and quotation marks omitted). "Findings of fact are

2

supported by substantial evidence when we can discern a rational premise for those findings from the evidence preserved in the record." *Wyodak,* ¶ 14, 387 P.3d at 729.

[¶7]    "We review an agency's conclusions of law *de novo* and affirm when they are in accordance with the law. However, when the agency has failed to properly invoke and apply the correct rule of law, we correct the agency's error." *Id.,* ¶ 15, 387 P.3d at 730 (citing *Dale,* ¶ 26, 188 P.3d at 561-62). This case requires interpretation of the relevant statutes and the Purchase Agreement. Interpretation of a statute involves a question of law and is reviewed *de novo. Id.; DB v. State (In re CRA),* 2016 WY 24, ¶ 15, 368 P.3d 294, 298 (Wyo. 2016). Likewise, interpretation of an unambiguous contract is a matter of law subject to *de novo* review. *Ecocards v. Tekstir, Inc.,* 2020 WY 38, ¶ 18, 459 P.3d 1111, 1118 (Wyo. 2020) (citing *Fix v. Forelle,* 2014 WY 79, ¶ 16, 327 P.3d 745, 749 (Wyo. 2014), and *Finley Res., Inc. v. EP Energy E&P Co., L.P.,* 2019 WY 65, ¶ 7, 443 P.3d 838, 842 (Wyo. 2019)).

## DISCUSSION

### A. *Natural Gas Taxation*

[¶8]    Mineral taxation is governed by statute. To interpret the relevant statutes, "[w]e seek the legislature's intent 'as reflected in the plain and ordinary meaning of the words used in the statute[s].'" *In re Est. of Britain,* 2018 WY 101, ¶ 15, 425 P.3d 978, 982-83 (Wyo. 2018) (quoting *TW v. State,* 2017 WY 26, ¶ 12, 390 P.3d 357, 360 (Wyo. 2017), and *Butler v. State*, 2015 WY 119, ¶ 7, 358 P.3d 1259, 1262 (Wyo. 2015)) (some quotation marks omitted).

> Where legislative intent is discernible a court should give effect to the most likely, most reasonable, interpretation of the statute, given its design and purpose. In light of this objective . . . [,]
>
> > [w]e . . . construe each statutory provision *in pari materia*, giving effect to every word, clause, and sentence according to their arrangement and connection. To ascertain the meaning of a given law, we also consider all statutes relating to the same subject or having the same general purpose and strive to interpret them harmoniously. . . . When the words used convey a specific and obvious meaning, we need not go farther and engage in statutory construction.

*Id.*, ¶ 15, 425 P.3d at 983 (quoting *Blevins v. State,* 2017 WY 43, ¶ 27, 393 P.3d 1249, 1256 (Wyo. 2017)) (other citations and quotation marks omitted).

[¶9]    Wyoming statutes authorize levies of severance and ad valorem taxes on the fair market value of gross natural gas production.  Wyo. Stat. Ann. §§ 39-14-203(a)(i), (b)(ii) (LexisNexis 2023) (severance tax), and 39-13-103(b)(iii)-(iv) (LexisNexis 2023) (ad valorem tax).  The point of valuation for natural gas is at the end of the production process. Section 39-14-203(b)(ii).  *See also, Solvay Chems., Inc. v. Wyo. Dep't of Revenue,* 2022 WY 122, ¶ 15, 517 P.3d 1123, 1129 (Wyo. 2022) ("the fair market value for natural gas is to be determined 'after the production process is completed'" (quoting § 39-14-203(b)(ii))). In circumstances such as this case when the natural gas is not "sold at or prior to the point of valuation," the legislature provides several options for determining the fair market value of the gas.  Section 39-14-203(b)(vi)(A)-(E).  Jonah chose the Netback valuation method found in § 39-14-203(b)(vi)(C).  That provision states:  "The fair market value [of the gas] is the sales price minus expenses incurred by the producer for transporting produced minerals to the point of sale and third party processing fees." *Id.*

[¶10]  The dispute in this case is whether the Board should have accounted for the Shortfall Capacity Deficiency Fee in calculating the "sales price" for Jonah's New Production under the Purchase Agreement to determine the fair market value for tax purposes.  "Sales price" is statutorily defined as "the transaction price determined in connection with a bona fide arm's length sale."  Wyo. Stat. Ann. § 39-14-201(a)(i) (LexisNexis 2023).  The parties agree the Purchase Agreement represents an arm's length sale.  However, they disagree over the "transaction price."  The terms "transaction" and "price" are not defined by statute. Therefore, we use their plain and ordinary meaning.  *In re Est. of Britain,* ¶ 15, 425 P.3d at 983.  "Transaction" means "[t]he act or an instance of conducting business or other dealings; esp., the formation, performance, or discharge of a contract."  *Transaction,* BLACK'S LAW DICTIONARY (10th ed. 2014).  "Price" is defined as "[t]he amount of money or other consideration asked for or given in exchange for something else; the cost at which something is bought or sold."  *Price,* BLACK'S LAW DICTIONARY (10th ed. 2014).  Using these definitions, the "transaction price" is the cost at which something is bought or sold under a contract.  In this case, the transaction price is the cost at which the New Production was bought by Enterprise Products and sold by Jonah under the Purchase Agreement.

### *B.  Contract Sales Price*

[¶11] To determine the sales price of Jonah's New Production under the Purchase Agreement, we must interpret the contractual language.  A court's goal in interpreting a contract is to determine "the parties' intent[.]"  *Hassler v. Circle C Res.,* 2022 WY 28, ¶ 12, 505 P.3d 169, 173 (Wyo. 2022) (citing *P&N Invs., LLC v. Frontier Mall Assocs., LP,* 2017 WY 62, ¶ 10, 395 P.3d 1101, 1104 (Wyo. 2017) (the court interprets a contract to discern the intention of the parties)) (other citation omitted).  Interpretation of a contract begins with an analysis of its plain language.  *Thornock v. Pacificorp,* 2016 WY 93, ¶ 13,

4

379 P.3d 175, 180 (Wyo. 2016) (citing *Claman v. Popp*, 2012 WY 92, ¶ 26, 279 P.3d 1003, 1013 (Wyo. 2012)).

> "[T]he words used in the contract are afforded the plain meaning that a reasonable person would give to them. *Doctors' Co. v. Insurance Corp. of America*, 864 P.2d 1018, 1023 (Wyo. 1993). When the provisions in the contract are clear and unambiguous, the court looks only to the "four corners" of the document in arriving at the intent of the parties. *Union Pacific Resources Co.* [*v. Texaco*], 882 P.2d [212,] 220 [(Wyo.1994)]; *Prudential Preferred Properties* [*v. J and J Ventures*], 859 P.2d [1267,] 1271 [(Wyo. 1993)]. In the absence of any ambiguity, the contract will be enforced according to its terms because no construction is appropriate. *Sinclair Oil Corp. v. Republic Ins. Co.*, 929 P.2d 535, 539 (Wyo. 1996)."

*Id.* (quoting *Claman,* ¶ 26, 279 P.3d at 1013). We review a contract in its entirety and consider each provision in light of the others, avoiding an interpretation that makes any provision inconsistent or meaningless. *Id.*, ¶ 13, 379 P.3d at 180.

[¶12] In § 3.1 of the Purchase Agreement, Jonah agreed "to sell and ratably deliver . . . the New Production to . . . Enterprise [Products] each [d]ay during the [t]erm of th[e] [a]greement and Enterprise [Products agreed to] purchase the New Production" at the outlet of the Pioneer Plant. The Purchase Agreement delineated the volume of New Production Enterprise Products committed to buy from Jonah (Committed Volume). The Committed Volume of New Production was determined by adding "Primary Capacity" and "Secondary Capacity" and then subtracting Base Production. Primary Capacity was generally set at 16,000 barrels per day, which came first from Base Production. If Base Production did not provide the full 16,000 barrels of Primary Capacity, the deficiency would be filled by New Production. Once Primary Capacity was satisfied, additional New Production would be allocated to Secondary Capacity. Secondary Capacity was limited to 4000 barrels per day and could only be utilized for New Production and after Primary Capacity was fully utilized.

[¶13] Article 4 of the Purchase Agreement was titled: "Component Purchase Price; Shortfalls & Payments." Section 4.1 set the price Enterprise Products paid for Jonah's New Production, which was called the "Monthly Component Purchase Price" (MCPP). The MCPP was calculated by subtracting the "Transportation Fee" and "Fractionation Fee" from the "Index Price," i.e., "MCPP = IP – TF – FF." Each of the MCPP variables was defined in a particular section of the Purchase Agreement. The Index Price was generally defined in § 4.2(A) as the sum of the prices for the individual components, such as ethanol, butane, propane, and gasoline, derived from fractionation of the New Production at the Texas plant.

[¶14]  The Transportation Fee was defined in § 4.3 as the fee for transportation of "each [g]allon of New Production delivered by Jonah . . . and accepted by Enterprise [Products]" at the outlet of the Pioneer Plant.  The Transportation Fee differed for Primary and Secondary Capacity.  Section 4.3(A) included a table showing rates for the Transportation Fee and a "Transportation Shortfall Fee" we will discuss later in this opinion:

| Capacity | Transportation Fee | Transportation Shortfall Fee |
|---|---|---|
| Primary Capacity and Excess Volume | a. $0.1292 per Gallon; and<br><br>b. The above fee shall escalate pursuant to Paragraph B below. | None |
| Secondary Capacity | The then current Volume Fee provided for in the MAPL TSA for a Mont Belvieu destination.<br><br>On the date that is 10 Years after July 1, 2014, the Secondary Capacity Transportation Fees shall be reduced to the Primary Capacity Transportation Fees with no Shortfall Volume Fee provided for in the MAPL TSA for a Mont Belvieu destination. | The then current Shortfall Volume Fee provided for in the MAPL TSA for a Mont Belvieu destination. |

[¶15]  The Fractionation Fee was defined in § 4.4 of the Purchase Agreement as the fee for fractionation of each "[g]allon of New Production delivered by Jonah Energy and accepted by Enterprise [Products]" at the outlet of the Pioneer Plant.  The Fractionation Fee was calculated with the following formula:  "$0.0080/Gallon x (Fuel Index/$3.60) + Fixed Fee."  The means of calculating the Fuel Index and Fixed Fee were set out in the Purchase Agreement.  The following table shows the Fixed Fee:

6

| Capacity | Fixed Fee |
|----------|-----------|
| Primary Capacity and Excess Volume | The greater of: <br> (a) $0.0510 per Gallon; or <br> (b) An amount determined under the following formula: <br> Fixed Fee * MTU |
| Secondary Capacity | The greater of: <br> (a) $0.0565 per Gallon; or <br> (b) An amount determined under the following formula: <br> Fixed Fee * MTU |

[¶16]   There is no dispute in this case over the proper deductions from the Index Price for the Transportation and Fractionation Fees on the New Production Jonah actually delivered to Enterprise Products.  The dispute is over whether the Shortfall Capacity Deficiency Fee (SCDF) should be deducted from the Index Price to determine the "sales price" and taxable value of the New Production Jonah sold to Enterprise Products.  The SCDF was not referenced in § 4.1 which defined the MCPP.  Rather, the SCDF was separately addressed in § 4.5 of the Purchase Agreement, which was titled "Shortfalls and Deficiency Payments."  In general, the SCDF was a fee Jonah paid to Enterprise Products any month it failed to deliver the full volume of Secondary Capacity, i.e., there was a "Secondary Capacity Shortfall Volume."

[¶17]   The SCDF had two parts – the Transportation Shortfall Fee and the Fixed Fee portion of the Fractionation Fee.  The SCDF was defined as:

> For each Month in which the Secondary Capacity Shortfall Volume is a positive number, Enterprise [Products] will invoice Jonah . . . and Jonah . . . will pay Enterprise [Products] an amount ("the Shortfall Capacity Deficiency Fee Payment") equal to the product obtained by multiplying (i) the sum of (a) the then in effect Fixed Fee portion of the Fractionation Fee associated with Secondary Capacity plus (b) the then in effect Transportation Shortfall Fee associated with Secondary Capacity by (ii) the Secondary Capacity Shortfall Volume.

[¶18]   The Board determined the SCDF was not a component of the sales price under the terms of the Purchase Agreement, and consequently was not "to be considered in determining the fair market value of Jonah's production under the Netback Method. Rather, it [was] a separate fee that Enterprise [Products] charge[d] Jonah."  In justifying its

7

decision, the Board noted that the Purchase Agreement's MCPP formula for calculating the price Enterprise Products paid for Jonah's New Production did not include the SCDF. Instead, Enterprise Products separately invoiced Jonah for the SCDF each month it did not deliver the full volume of Secondary Capacity, which the Board said "further distance[d] the SCDF from the sales price."

[¶19]   Jonah claims that the Board's interpretation of the Purchase Agreement was faulty and, when the contract is interpreted in its entirety, it is clear Jonah should be allowed to deduct the SCDF in determining the New Production sales price. According to Jonah, the SCDF was "negotiated as part of the parties' purchase price in order for Jonah to secure priority firm transportation on the MAPL pipeline and at the [f]ractionation [p]lant" for its Secondary Capacity New Production. Jonah argues the Board erred by failing to take into account the "total consideration in the transaction," which included the SCDF. There are several errors in Jonah's argument.

[¶20]   First, the Purchase Agreement clearly set out the formula for the sales price of Jonah's New Production, and it did not include the SCDF. In § 3.1 of the Purchase Agreement, Jonah agreed to "sell" and "deliver" its New Production to Enterprise Products at the outlet of the Pioneer Plant. Section 4.1 stated that Enterprise Products would purchase Jonah's New Production for a price referred to as the MCPP. In other words, the MCPP was the "sales" or "transaction" price the parties contractually agreed in the Purchase Agreement represented the cost of the New Production. The MCPP was defined as the Index Price (prices of the components) minus the Transportation and Fractionation Fees as shown in the formula -- MCPP = IP – TF – FF. The MCPP/sales price was based on the value of, and costs associated with, the New Production actually delivered by Jonah to Enterprise Products. The MCPP formula did not include the SCDF because it was not charged when Jonah delivered New Production to Enterprise Products but rather when Jonah did not deliver the full amount of Secondary Capacity for the month.

[¶21]   Jonah maintains the SCDF should have been considered part of the Transportation and Fractionation Fees deducted from the Index Price to arrive at the MCPP. This argument ignores that the Transportation and Fractionation Fees were expressly charged for "each [g]allon of New Production *delivered* by Jonah . . . and *accepted* by Enterprise [Products]" at the outlet of the Pioneer Plant. (Emphasis added). The SCDF was separately addressed in § 4.5 of the Purchase Agreement, which was titled "Shortfalls and Deficiency Payments." Under § 4.5, the SCDF applied only when Jonah failed to deliver the full amount of Secondary Capacity for the month. The only reference to shortfall fees outside of § 4.5 was in the table in § 4.3 setting Transportation Fees and Transportation Shortfall Fees for Primary and Secondary Capacity. However, the mention of the Transportation Shortfall Fee in § 4.3 did not mean it was part of the Transportation Fee used in calculating the MCPP/sales price. Rather, because the rates for the Transportation and the Transportation Shortfall Fees for Jonah's New Production were linked to MAPL prices, the parties simplified the Purchase Agreement by including both rates in § 4.3. Notably,

8

there was no comparable reference to fractionation shortfall fees in the fixed fee table in § 4.4, which would be expected if the SCDF was simply part of the Transportation and Fractionation Fees as Jonah suggests. Had the parties intended the Transportation Shortfall Fee, the Fixed Fee for shortfalls in fractionation volumes, and the SCDF be included under general Transportation and Fractionation Fees for calculation of the MCPP/sales price, they would have made that clear in §§ 4.1, 4.3, and 4.4 and would not have separately addressed the SCDF in § 4.5.

[¶22]  Second, Jonah did not "secure" transportation or fractionation space for the New Production on the MAPL or at the fractionation plant. Under the terms of the Pioneer Plant processing agreement between Jonah and Enterprise Processing, Jonah was responsible for making "downstream arrangements" for transportation of the New Production when it left the Pioneer Plant. This makes sense because the New Production came from Jonah's wells and the Pioneer Plant simply processed the gas by separating the NGL from residue gas.[3] Jonah needed to arrange for what would happen to the New Production after it left the Pioneer Plant. It did so by entering into the Purchase Agreement to sell the New Production to Enterprise Products, which took title to it at the outlet of the Pioneer Plant and arranged for its transportation on MAPL and fractionation at the plant in Texas. The Purchase Agreement simply recognized the reality that the value of the New Production could not be determined until it was fractionated into its individual components. To arrive at a sales price for the New Production at the point of sale (outlet of the Pioneer Plant), the parties had to account for the value of the components and the expenses incurred in determining that value, i.e., transportation to the fractionation plant and fractionation, which is exactly what they did in the MCPP/sales price formula.

[¶23]  Finally, the SCDF was a separately invoiced expense. Section 4.6 of the Purchase Agreement stated that "Enterprise [Products would] invoice Jonah . . . once a [m]onth for the charges associated with Shortfall Volumes, Jonah['s] Emission Cost Allocation and Pipeline Off-Spec Fees." The Emission Cost Allocation and Pipeline Off-Spec Fees were not included in calculating the MCPP/sales price of Jonah's New Production. Jonah does not argue those other expenses should have been counted in determining the sales price and offers no explanation for why the parties would lump the SCDF together with the other non-deductible fees in the Purchase Agreement if the SCDF was actually a part of the MCPP/sales price. We recognize Enterprise Products "netted" the invoiced expenses against the amount Enterprise Products owed Jonah for the New Production in each month's settlement statement. However, there is no indication that by using this billing procedure, the parties intended the separately invoiced expenses to be part of the MCPP/sales price. Enterprise Products simply accounted for the separate charges in the final monthly bill.

---

[3] The NGL from Jonah's Base Production was retained by Enterprise Processing as consideration for processing Jonah's gas at the Pioneer Plant.

[¶24] Much of Jonah's argument is focused on the value it received from having the Secondary Capacity available for its New Production. It directs us to various provisions of the Purchase Agreement which show the Secondary Capacity had "priority" for pipeline and fractionation services when the MAPL or the fractionation plant curtailed service. We agree that, under the terms of the Purchase Agreement, the Secondary Capacity was advantageous to Jonah because it provided assurance that Enterprise Products would be able to fulfill its obligation to purchase Jonah's New Production in the event of a curtailment. The Purchase Agreement recognized that Enterprise Products provided this advantage to Jonah, and in consideration for it, Jonah agreed to pay the SCDF when it did not deliver the full amount of Secondary Capacity. That does not mean, however, that the SCDF was necessarily a component of the sales price for the New Production Jonah actually delivered.

[¶25] Jonah also maintains the Board's interpretation of the sales price for Jonah's New Production imposes an inappropriate "unit-based" sales price which is inconsistent with *WPX Energy Rocky Mountain, LLC v. Wyo. Dep't of Revenue,* 2022 WY 104, 516 P.3d 449 (Wyo. 2022). WPX Energy reported the taxable value of its natural gas production using the Netback valuation method, which allows a deduction from the sales price for "'expenses incurred by the producer for transporting produced minerals to the point of sale[.]'" *Id.*, ¶ 7, 516 P.3d at 452 (quoting § 39-14-203(b)(vi)(C)). It sought to deduct, as a cost of transportation to the point of sale, a fixed fee it paid to reserve pipeline capacity even when it did not use the capacity to transport its gas. *Id.*, ¶¶ 5, 8, 516 P.3d at 451-52. Applying the ordinary meaning of the terms "transport" and "expense," we concluded that expenses WPX Energy incurred in transporting its gas, including all the costs associated with reserving capacity on a pipeline when it used some but not all its reserved capacity, qualified as deductible transportation expenses under § 39-14-203(b)(vi)(C). *Id.*, ¶¶ 22-30, 516 P.3d at 455-57. We rejected a "unit-based" approach advocated by the DOR which would have only allowed WPX Energy to deduct the reservation fee for the volume of gas it actually transported. *Id.*, ¶¶ 19, 21, 516 P.3d at 454-55. We concluded the legislature intended for transportation expenses to refer both to the cost of moving the gas and the cost of operating the equipment necessary to move the gas. *Id.*, ¶¶ 23-24, 516 P.3d at 455-56. When WPX Energy transported any amount of gas, it was engaging in transportation which made the entire reservation fee deductible. *Id.*

[¶26] *WPX Energy* is distinguishable from this case because it addressed the statutory definitions of "transport" and "expense" from § 39-14-203(b)(vi)(C), while we are considering contractual language specifically defining the terms MCPP, Transportation Fee, Fractionation Fee, and SCDF from the Purchase Agreement. The costs at issue are also different. In *WPX Energy* the cost was one incurred by the producer prior to the point of sale, while we are considering a cost initially incurred by the purchaser of the New Production after the point of sale and reimbursed by the producer under the terms of the Purchase Agreement. Finally, WPX Energy paid the reservation fee regardless of whether

10

it used pipeline space, while Jonah only incurred the SCDF when it did not provide the entire committed volume of Secondary Capacity New Production.

[¶27] As we recognized in *WPX Energy,* the legislature specifically addressed transportation fees incurred prior to the point of sale in the Netback statute. The legislature did not, however, address the deductibility of costs incurred by the producer after the point of sale, which recognizes that the producer and purchaser balance the product value and costs in arriving at an arms-length sales price. If the legislature intended to allow all fees, regardless of when, where, or how incurred, to be deductible from the sales price, there would have been no reason to specifically address fees incurred by the producer prior to the point of sale in § 39-14-203(b)(vi)(C).

[¶28] Jonah also cites to *Indep. Petroleum Ass'n v. DeWitt,* 279 F.3d 1036 (D.C. Cir. 2002), as support for its argument that the SCDF should be deducted from the MCPP to arrive at the sales price for its New Production. The D.C. Circuit affirmed the lower court's ruling that federal regulations, which did not allow mineral lessees to deduct unused firm demand pipeline charges from royalties as transportation costs, were unlawful. *Indep. Petroleum,* 279 F.3d at 1038-39, 1042-43. As the Board correctly observed, *Independent Petroleum* is inapposite to our interpretation of the Purchase Agreement because it considered whether a federal agency's regulation of royalties and transportation costs complied with federal statutes.

[¶29] We conclude the plain language of the Purchase Agreement did not make the SCDF a component of the MCPP/sales price for New Production. The Board correctly determined it was a separate fee Jonah paid when it did not tender the full amount of Secondary Capacity to Enterprise Products.

## C. Surrounding Circumstances

[¶30] Jonah argues the Board erred by refusing to consider the facts and circumstances surrounding execution of the Purchase Agreement as evidence of the parties' intent to include the SCDF as part of the MCPP/sales price for the New Production. The facts and circumstances referenced by Jonah were primarily provided through the expert testimony of Christopher Barr, an attorney with extensive experience in natural gas and NGL pipeline regulation. Mr. Barr recited the history of interstate pipelines and explained how the federal government regulated the price charged by pipeline companies. He testified NGL shippers could ensure access to pipeline capacity by contracting for "priority service" or "priority rights" using a specific regulatory process. A shipper with priority service paid for volumes of NGL it transported and a deficiency charge for committed volumes it did not transport. Mr. Barr testified Enterprise Products had priority service on MAPL for the Secondary Capacity, and Jonah did not have the ability to acquire shipper rights on MAPL because it was fully subscribed.

11

[¶31] Evidence of facts and circumstances surrounding execution of a contract is not routinely admissible in interpreting the contractual language. We explained in *Thornock v. Pacificorp,* ¶ 19, 379 P.3d at 181, this rule of contract interpretation is used only in limited circumstances "where an otherwise unambiguous term had a different, special, or technical usage at the time the contract was executed." Facts and circumstances outside the four corners of the contract cannot be used to explain, in general terms, what parties must have intended when they executed the contract. *Id.,* ¶ 21, 379 P.3d at 182; *Gumpel v. Copperleaf Homeowners Assoc., Inc.,* 2017 WY 46, ¶¶ 58-59, 393 P.3d 1279, 1296 (Wyo. 2017). Extrinsic evidence is only admissible to "provid[e] an industry standard or a specialized meaning to a particular term." *Thornock,* ¶ 21, 379 P.3d at 182.

[¶32] Examples of cases appropriately applying the extrinsic evidence rule include *Hickman v. Groves,* 2003 WY 76, ¶¶ 14-15, 71 P.3d 256, 261-62 (Wyo. 2003), and *Mullinnix LLC v. HKB Royalty Tr.,* 2006 WY 14, ¶¶ 6, 13-29, 126 P.3d 909, 916-22 (Wyo. 2006), where we considered whether the circumstances surrounding execution of deeds in the 1940s showed the term "oil rights" had a specific trade meaning which included "gas rights" even though the word "gas" was not used in the deeds. In *Caballo Coal Co. v. Fidelity Expl. & Prod. Co.,* 2004 WY 6, ¶¶ 8-11, 84 P.3d 311, 314-17 (Wyo. 2004), we allowed evidence of the facts and circumstances surrounding execution of deeds in 1975 conveying "all other minerals, metallic or nonmetallic contained in or associated with the deposits of coal" to determine if the grantor intended to include coal bed methane in the conveyance. In *Ecosystem Res., L.C. v. Broadbent Land & Res., LLC,* 2012 WY 49, ¶¶ 8, 12, 20, 33-34, 275 P.3d 416-18, 420, 423 (Wyo. 2012), we reviewed evidence of the facts and circumstances surrounding a grantor's execution of deeds in the early 1900s which reserved its right to the "timber" on the property to determine whether the reservation was limited to the then-existing trees which could be harvested within a reasonable time or was perpetual and included future tree growth. In *Boley v. Greenough,* 2001 WY 47, ¶¶ 20-21, 22 P.3d 854, 860 (Wyo. 2001), this Court considered evidence of the trade usage of the term "overriding royalty" at the time of execution of the deeds to determine the grantors' intent.

[¶33] Jonah does not identify any terms in the Purchase Agreement having different, special, or technical meanings which would warrant the use of extrinsic evidence of surrounding facts and circumstances. Mr. Barr's testimony about the history and regulation of pipeline transportation of natural gas and NGL was outside the four corners of the contract and did not explain the meaning of any particular term. Instead, Jonah attempted to use facts and circumstances evidence to add language to the Purchase Agreement making the SCDF part of the MCPP/sales price. Such evidence is contrary to the plain language of the agreement which stated the MCPP/sales price was the Index Price minus the Transportation and Fractionation Fees for the New Production Jonah actually sold to Enterprise Products. Jonah's evidence was not appropriate extrinsic evidence of a different, special, or technical meaning of a particular term in the contract.

[¶34]  The Board properly discounted Mr. Barr's testimony because there was no basis for looking outside the four corners of the Purchase Agreement to determine its meaning.

## CONCLUSION

[¶35]  The Board correctly ruled the plain language of the Purchase Agreement did not include the SCDF as a component of the sales price for Jonah's New Production and extrinsic evidence of the circumstances surrounding execution of the Purchase Agreement was not admissible to interpret it.

[¶36]  Affirmed.