# IN THE SUPREME COURT, STATE OF WYOMING

## 2025 WY 126

OCTOBER TERM, A.D. 2025

December 2, 2025

WYOMING DEPARTMENT OF
REVENUE,

Appellant
(Petitioner),

v.                                                      S-25-0006

PACIFICORP and MERIT ENERGY
COMPANY, LLC,

Appellees
(Respondents).

### Appeal from the District Court of Laramie County
The Honorable Catherine R. Rogers, Judge

*Representing Appellant:*
> Bridget Hill, Wyoming Attorney General; Brandi Monger, Deputy Attorney General; Karl D. Anderson, Supervising Attorney General; James Peters, Senior Assistant Attorney General. Argument by Mr. Peters.

*Representing Appellee Merit Energy Company, LLC:*
> Jeffrey S. Pope, Kasey J. Schlueter, Holland & Hart LLP, Cheyenne, Wyoming; Stephen Masciocchi, Holland & Hart LLP, Denver, Wyoming. Argument by Mr. Pope.

*Before BOOMGAARDEN, C.J., and GRAY, FENN, JAROSH, JJ., and HIBBEN, D.J.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**JAROSH, Justice.**

[¶1]     The Wyoming Department of Revenue (Department) denied a request to refund a portion of the sales tax collected from Merit Energy Company (Merit) on electricity the company purchased between March 2020 and March 2023.  Merit used the electricity to operate its oil fields in Wyoming and argues the purchases are exempt from sales tax because Merit is engaged in the transportation business.

[¶2]     After the Department denied the refund request, Merit appealed the decision to the Wyoming State Board of Equalization (Board).  Following a contested case hearing, the Board held Merit met the requirements for the sales tax exemption.  The Department filed a petition for review with the district court.  Merit then moved to certify the case to the Wyoming Supreme Court pursuant to Wyoming Rule of Appellate Procedure 12.09(b) (W.R.A.P.), and shortly after the Department joined in the motion.  After the district court granted the motion, we accepted the certified case.  We reverse the Board's decision.

### ISSUE

[¶3]     The Department presents the following issue on appeal:

> Did the Wyoming State Board of Equalization err when it concluded a portion of the electricity Merit purchased from PacifiCorp qualified for the sales tax exemption under Wyo. Stat. Ann. § 39-15-105(a)(iii)(E) (2023)?

[¶4]     In addition, Merit raises the following threshold issue:

> Does the Board's final decision in a prior case involving the same parties and issues collaterally estop the Department from arguing the same issues to this Court?

### FACTS

[¶5]     Merit produces oil and gas in Wyoming.  It operates electronic submersible pumps and, to a lesser extent, pumpjacks to extract a mixture of crude oil, produced water, and gas from under the ground.  The electronic submersible pumps and pumpjacks generate sufficient pressure to:  (1) lift the fluids to the wellhead at the surface; (2) move the fluids from the wellhead to a surface facility for separation; and (3) convey the separated crude oil to the point of custody transfer known as a Lease Automatic Custody Transfer (LACT) unit.  When necessary, Merit also employs other electric-powered surface equipment to assist surface operations, separate produced water from crude oil, and reinject produced water.

1

[¶6]    Merit maintains it is entitled to a refund of the sales tax collected on a percentage of the electricity it purchased because it was used for the movement of production fluids from the wellhead to the LACT.  According to Merit, this activity qualifies as "engaged in the transportation business" and exempts the purchases from taxation as stated in Wyo. Stat. Ann. § 39-15-105(a)(iii)(E) (2023).[1]  To support its refund request, Merit commissioned a third-party to conduct utility studies for each of its operations.  These utility studies determined the percentage of electricity used to vertically lift the fluids to the surface compared to the percentage needed to move the fluids horizontally at the surface.

**Merit's Oil and Gas Operations**

[¶7]    The utility studies examined five Merit assets and described their operations at the unit-level.  Merit representatives acknowledge its Wyoming units are "one in the same" in that the oil fields are mature and produce large volumes of water for a comparatively small amount of crude oil.  It is not uncommon for Merit to produce 1,000 barrels of water to recover ten barrels of crude oil.  The company operates these units for secondary recovery purposes,[2] meaning Merit reinjects much of the produced water into the same underground reservoir to assist in producing crude oil as the fields age.

[¶8]    The utility studies documented the lifecycle of Merit's operations once the electric submersible pumps and pumpjacks deliver the production fluids to the surface.  First, excess pressure from the electric submersible pumps and pumpjacks moves the fluids from each wellhead to a centralized surface facility, also known as a battery.  At each battery, Merit operates knock-out vessels, heater-treaters, and accumulation tanks to separate the produced water from the crude oil.  Then, using excess pressure from the extraction process, Merit sends the separated water to a disposal site or a reinjection well.  The reinjection wells return the water underground using either gravity or high pressure pumps.

[¶9]    The separated crude oil, again using excess pressure from the extraction process, is transported from the battery to a LACT facility.  Merit temporarily stores the crude oil at the LACT facility until it is metered and marketed through the LACT.  After custody of the crude oil changes at the LACT, third-party entities transport the crude oil to refineries via pipeline.

---

[1] The Wyoming Legislature amended the sales tax exemption at issue in 2025.  *See* 2025 Wyo. Sess. Laws ch. 104, § 1 (codified at Wyo. Stat. Ann. § 39-15-105(a)(iii)(E) (2025)).  The challenged activities occurred between March 1, 2020, through March 31, 2023, and prior to that enactment, therefore, our analysis applies the 2023 version of the sales tax exemption.

[2] Broadly defined, secondary recovery "includes all methods of oil extraction in which energy sources extrinsic to the reservoir are utilized in the extraction."  *Gilmore v. Oil & Gas Conservation Comm'n*, 642 P.2d 773, 774 n.4 (Wyo. 1982) (quoting 8 Williams & Meyers, Oil and Gas Law, Manual of Terms, p. 681 (1981)).  More narrowly, secondary recovery is when "fluid (water, gas, or air) is injected into the formation through an input well and oil is removed from surrounding wells."  *Id.*

[¶10]   The utility studies divided electrical use into three categories:  (1) extraction; (2) post-wellhead transportation; and (3) other.  Post-wellhead transportation included the electricity consumed by surface equipment and the partial energy usage of the electronic submersible pumps and pumpjacks needed to move fluids from the wellhead, through the surface facilities, and to the LACT.  Across all the units, post-wellhead production accounted for approximately 46.1 percent to 54.8 percent of all electricity Merit purchased.

[¶11]   Merit does not own any of the crude oil it produces; instead, it is hired to operate the units for the working interest owners[3] who do.  Merit's relationship with the working interest owners is governed by various unit operating agreements.  The unit operating agreements give Merit the exclusive right to operate the unit and manage the accounting.

[¶12]   Under the unit operating agreements, Merit is responsible for all operating expenses.  Merit charges its expenses to a joint account where account credits are also posted.  The joint account allows the working interest owners to monitor expenses because each working interest owner is responsible for their respective portion of the operating expenses.

**The Spring Creek Audit**

[¶13]   The Department audited the Spring Creek Oil Field in 2021 (the Spring Creek Audit) and concluded Merit had a tax deficiency for its transactions between February 1, 2017, and January 31, 2020.  *See In re Merit Energy Company*, 2023 WL 11227707, *2-3, ¶¶ 15-17, Docket No. 2021-109 (Wyo. State Bd. of Equalization, Mar. 16, 2023).  Merit appealed to the Board and raised a series of issues with the Department's assessment.  *Id.* at *3, ¶ 18.  The parties resolved several issues through stipulations.  *Id.* at *3, ¶¶ 19-20.  Notably, the Department conceded Merit satisfied "all parts" of the legal question of whether its purchase of electricity constituted the "sale of power or fuel to a person engaged in the transportation business."  *Id.* at *5, ¶ 15.

[¶14]   Ultimately, the parties presented a single issue to the Board: "whether under § 39-15-105(a)(iii)(E), Merit is due a refund for a portion of the excise taxes it paid on electricity purchased from Rocky Mountain Power and used by electronic submersible pumps."  *Id.* at *1, ¶ 4.  The Board issued its order on March 16, 2023, and concluded Merit demonstrated it was entitled to the tax exemption for a portion of the electricity the company had used and reversed the Department's findings.  *Id.* at *6, ¶ 21.

---

[3] A "working interest owner" is an entity that receives a portion of the production proceeds from a well in exchange for paying its share of the expenses for developing and operating the well.  *Chesapeake Exploration, LLC v. Morton Production Co.*, 2025 WY 15, ¶ 6, 562 P.3d 1286, 1291 (Wyo. 2025); *see also* Wyo. Stat. Ann. § 30-5-304(a)(viii) (defining "working interest" as "the interest granted under an oil and gas lease, giving the lessee the right to work on the leased property to search for, develop and produce oil and gas and the obligation to pay all costs of production").

[¶15] The Board, however, expressed doubt that Merit was actually "engaged in the transportation business." *Id.* at \*5, ¶ 15, n.3. Nonetheless, the Board's order explained that specific issue was not before it because "the Department has conceded the point." *Id.* The Department did not appeal the Board's order.

**The Department denies the tax refund request**

[¶16] In proceedings entirely separate from the Spring Creek Audit, PacifiCorp, acting on behalf of Merit, submitted a sales tax refund request to the Department on April 27, 2023.[4] The refund request sought $3,018,675 in sales taxes Merit paid from March 2020 to March 2023. This request involved different tax years from the Spring Creek Audit and included a broader range of Merit's assets. PacifiCorp cited the Board's order from the Spring Creek Audit and claimed Merit was entitled to the refund because a portion of the electricity it purchased was used to move production fluids horizontally from the wellhead to the LACT.

[¶17] The Department denied the request on May 16, 2023. In its denial letter, the Department concluded Merit is not "engaged in the transportation business" as required by Wyo. Stat. Ann. § 39-15-105(a)(iii)(E) (2023), and therefore, not eligible for the exemption. The Department also addressed the Board's prior decision in the Spring Creek Audit noting "[s]ince the parties to the appeal did not raise that specific issue, the Board did not ultimately address that question in the original Merit ruling." PacifiCorp, again acting on Merit's behalf, appealed the Department's denial to the Board.

**The Board determines Merit is entitled to the sales tax exemption**

[¶18] Following a contested case hearing, the Board concluded Merit is engaged in the transportation business as stated in Wyo. Stat. Ann. § 39-15-105(a)(iii)(E) (2023). The Board acknowledged the statute does not define the phrase "engaged in the transportation business" and considered the ordinary meaning of the terms "engage" and "business." It did not independently analyze the ordinary meaning of "transportation," but relied on the following reasoning:

> Lacking a more relevant definition of "engaged in a trade of [sic] business," we will again rely on the one provided by the [United States] Supreme Court: 1) "the taxpayer must be involved in the activity with continuity and regularity;" and 2) "the taxpayer's primary purpose for engaging in the activity must be for income or profit." That definition is also consistent with the Department's reading, as testified to by Mr. Fanning. [ ] Mr. Watson's uncontroverted testimony addressed both elements of that definition: he testified that Merit is [sic]

---

[4] The electric utility company, PacifiCorp, did not participate in the Wyoming Supreme Court appeal.

continuously uses its pipeline to move oil owned by others, and charges the oil owners for that service. Therefore, Merit is engaged in the transportation business.

The Board, in a divided opinion, reversed the Department's decision letter and ordered it to issue the requested refund.

[¶19] Chairman Martin Hardsocg dissented, arguing Merit's activities largely fall within a section of the mineral tax statutes that explain when the crude oil production process is complete. *See* Wyo. Stat. Ann. § 39-14-203(b)(iii) (2023). In response to Merit's argument its transportation business begins at the wellhead, the dissent also noted Wyoming law generally considers the movement of production fluids from the wellhead to surface facilities as "gathering." *See* Wyo. Stat. Ann. § 39-14-201(a)(ix) (2023).

[¶20] The Department appealed the Board's order to the district court. Merit moved to certify the case to this Court pursuant to W.R.A.P. 12.09(b). We granted the unopposed motion to certify.

## STANDARD OF REVIEW

[¶21] The Department challenges a Board decision following a contested case hearing. When an administrative agency's decision is certified to this Court under W.R.A.P. 12.09(b), we apply the standards for judicial review set forth in the Wyoming Administrative Procedure Act. *Chesapeake Operating, LLC v. Dep't of Revenue,* 2023 WY 107, ¶ 9, 537 P.3d 1134, 1138 (Wyo. 2023) (citations omitted). Section 16-3-114(c) provides, in relevant part, that the reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

Wyo. Stat. Ann. § 16-3-114(c)(ii). "We review an agency's conclusions of law de novo and affirm only if its conclusions are in accordance with the law." *Leal v. Dep't of Workforce Servs.*, 2024 WY 86, ¶ 11, 553 P.3d 1181, 1185 (Wyo. 2024) (citations omitted). Under this standard, no deference is afforded to the agency's determination, and this Court has authority to "correct any error made by the agency in either interpreting or applying the law." *Id.*

[¶22] "The agency's findings of fact after a contested case hearing are reviewed using the substantial evidence standard." *Jonah Energy LLC v. Dep't of Revenue*, 2023 WY 87, ¶ 6, 534 P.3d 902, 905 (Wyo. 2023) (citations omitted). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support' the decision." *Contango Res., LLC v. Fremont Cnty*., 2025 WY 29, ¶ 24, 565 P.3d 167, 174 (Wyo. 2025) (quoting *Teton Cnty. Assessor v. Aspen S, LLC*, 2024 WY 30, ¶ 7, 545 P.3d 427, 429 (Wyo. 2024)). "A finding of fact is supported by substantial evidence if, from the evidence preserved in the record, we can discern a rational premise for it." *Id.* (quoting *Gray v. Converse Cnty. Assessor*, 2023 WY 116, ¶ 7, 539 P.3d 107, 111 (Wyo. 2023)) (internal quotation omitted).

[¶23] Merit also argues collateral estoppel precludes our review of the issue presented. We review the application of collateral estoppel de novo. *Union Tel. Co. v. Wyo. Pub. Serv. Comm'n*, 2022 WY 55, ¶ 23, 508 P.3d 1078, 1089 (Wyo. 2022) (citations omitted.)

## DISCUSSION

## I.    Collateral estoppel does not bar the Department's appeal.

[¶24]  As a threshold matter, Merit argues the Department's appeal is barred by collateral estoppel. Merit maintains collateral estoppel applies because the Board purportedly found in the Spring Creek Audit appeal that "Merit's activities constituted transportation under Wyo. Stat. Ann. § 39-15-105(a)(iii)(E)." The Department argues the parties did not actually litigate the status of Merit's business in that proceeding because they narrowed the range of issues presented to the Board with pre-adjudication stipulations.

[¶25]  Collateral estoppel applies to issues adjudicated before an administrative agency if the issue adjudicated was a final determination. *Lower v. Peabody Powder River Servs., LLC*, 2020 WY 33, ¶ 14, 459 P.3d 443, 447 (Wyo. 2020); *see also Slavens v. Bd. of Cnty. Comm'rs for Uinta Cnty.*, 854 P.2d 683, 685 (Wyo. 1993) (recognizing collateral estoppel applies "to final adjudicative determinations by administrative tribunals"). Collateral estoppel bars consideration of an issue when four elements are satisfied:

> (1) the issue decided in the prior proceeding must be identical
> to the issue presented in the present action; (2) the prior

proceeding must have resulted in a judgment on the merits; (3) the party against whom collateral estoppel is asserted must have been a party to or in privity with a party to the prior adjudication; and (4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*Union Tel. Co.*, ¶ 24, 508 P.3d at 1089 (citation modified).

[¶26]   Unlike this case, the prior proceeding was the consequence of an excise tax audit the Department conducted and only involved electricity Merit purchased for its Spring Creek Field.  The Spring Creek Audit also involved different tax years.  The Department concluded Merit had a tax deficiency, and the company appealed the decision to the Board.

[¶27]   In its Spring Creek Audit appeal, Merit raised "a series of issues" and the parties "resolved all but one" prior to the Board's consideration.  Therefore, the parties presented a single stipulated issue to the Board: "[W]hether under Wyo. Stat. Ann. § 39-15-105(a)(iii)(E), Merit is due a refund for a portion of the excise taxes it paid on electricity purchased from Rocky Mountain Power and used by the electronic submersible pumps."

[¶28]   In the current appeal, the Department presents what is essentially an identical question — did the Board err when it concluded Merit qualified for the tax exemption in Wyo. Stat. Ann. § 39-15-105(a)(iii)(E).[5]  But the Department and Merit both present the issue on novel grounds, that is, whether the Board correctly decided Merit was engaged in the transportation business as used in Wyo. Stat. Ann. § 39-15-105(a)(iii)(E).  We have said "issue preclusion prevents the relitigation of issues actually and necessarily decided previously in an action between the same parties." *Bender v. Uinta Cnty. Assessor*, 14 P.3d 906, 910 (Wyo. 2000) (quoting *Univ. of Wyoming v. Gressley*, 978 P.2d 1146, 1153 (Wyo. 1999)).  Accordingly, we must determine whether the issue of Merit's business status (i.e., whether it was engaged in the transportation business) was "actually litigated" during the Board's adjudication of the Spring Creek Audit.

[¶29]   "The question of whether the issue was 'actually litigated' is closely related to the second requirement of collateral estoppel — that the prior adjudication resulted in a judgment on the merits." *Casiano*, ¶ 14, 434 P.3d at 121 (citing *Robert L. Kroenlein Trust*

_____

[5] The Department also contends collateral estoppel does not apply because this appeal involves different facts and circumstances than the action arising from the Spring Creek Audit.  We agree the present action is postured differently, involves a broader range of taxable assets, and involves different tax years.  The Department, however, does not argue how these factual differences are "essential" to the Board's decision as to render collateral estoppel inapplicable. *See, e.g., Worman v. Carver*, 2002 WY 59, ¶ 22, 44 P.3d 82, 88 (Wyo. 2002) (recognizing "changes in facts essential to a judgment will render collateral estoppel inapplicable in a subsequent action raising the same issues.") (quoting *Montana v. United States,* 440 U.S. 147, 159 (1979)).

7

*v. Kirchhefer*, 2015 WY 127, ¶ 40, 357 P.3d 1118, 1134 (Wyo. 2015)). "An issue is actually litigated, if it is properly raised in the pleadings or otherwise submitted for determination and is in fact determined." *Id.*, ¶ 13, 434 P.3d at 120 (citing 46 Am. Jur. 2d *Judgments* § 473 (2019)) (internal quotations and brackets omitted).

[¶30]   According to the Board's decision in the Spring Creek Audit appeal, the Department "concede[d]" Merit satisfied "all parts" as to whether the sale of power or fuel was to a person engaged in the transportation business.  The Board then provided the following footnote:

> We aren't convinced that Merit is "engaged in the transportation business" even though the electricity at issue is used to move production fluids through the gathering system. Just about any business that deals with tangible objects has to transport those objects at some point: a plumber transports materials and tools to a job site; a bakery transports a cake to a wedding reception; an art gallery transports a sculpture for installation in a client's building. They all transport things in the course of their businesses, but we don't believe they're engaged in "the transportation business." The statute's definite article "the" before the described noun "transportation business" refers to a specific business type, not a generic activity. The exemption's purpose is to exempt fuel and power that transportation businesses use or consume when providing a transportation service. Indeed, the operative statutory subsection is but one of several addressing a series of business sectors or types, i.e. manufacturing, processing, agriculture. But, **because the Department has conceded the point, that question is not before us and we cannot decide it.**  *Solvay Chem. Inc. v. Dep't of Revenue*, 2018 WY 124, 430 P.3d 295 (Wyo. 2018).

(emphasis added).  Ultimately, the Board concluded Merit was entitled to the exemption.

[¶31]   At oral argument, this Court probed the parties' positions regarding the potentially preclusive effect of the Department's position in the Spring Creek Audit appeal.  The Department stated it was a decision to narrow the legal issues presented to the Board. According to the Department, the question of whether Merit was engaged in the transportation business was therefore not presented to the Board, so the issue was not litigated.  Merit contends the Department's prior position was a legal concession that the Department is bound by in the present case.

8

[¶32]  The Department's position in the Spring Creek Audit appeal was a stipulation.  *See Hanft v. City of Laramie*, 2021 WY 52, ¶ 59, 485 P.3d 369, 386 (Wyo. 2021) (recognizing "[a] stipulation is an agreement, admission, or concession made in a judicial proceeding by the parties or their attorney's, respecting some matter or incident thereto.") (internal quotation omitted).  "A stipulation prevents an independent examination by a judicial officer or body with respect to the matters stipulated."  *Hanft*, ¶ 59, 485 P.3d at 386.  Because the Department stipulated Merit satisfied the "engaged in the transportation business" element of the statute in the prior proceeding, the Board did not independently examine and decide the issue, and therefore, the issue was not actually litigated before the Board.

[¶33]  Merit has not demonstrated that the Department's stipulation in the Spring Creek Audit appeal satisfies the second collateral estoppel element.  Therefore, collateral estoppel does not bar the Department's appeal.

## II.     The Board erred when it concluded Merit was engaged in the transportation business.

[¶34]  Our review of the Board's construction of the language in the sales tax exemption statute is a matter of statutory interpretation.  "Interpretation of a statute involves a question of law and is reviewed de novo."  *Jonah Energy LLC*, ¶ 7, 534 P.3d at 905.

[¶35]  When we interpret statutes, we first determine whether the statute is unambiguous.  *Chesapeake Operating, LLP*, ¶ 11, 537 P.3d at 1138 (citing *Exxon Mobil Corp. v. Dep't of Revenue*, 2009 WY 139, ¶ 12, 219 P.3d 128, 134 (2009)).  A statute is unambiguous if reasonable persons can agree as to its meaning with consistency and predictability.  *Id.*  When a statute is sufficiently clear and unambiguous, we give effect to the plain and ordinary meaning of the words and do not resort to the rules of statutory construction.  *BP America Prod. Co. v. Dep't of Revenue*, 2005 WY 60, ¶ 15, 112 P.3d 596, 604 (Wyo. 2005) (citations omitted).  Conversely, a statute is ambiguous only if it is found to be vague or uncertain and subject to varying interpretations.  *Chesapeake Operating LLP*, ¶ 11, 537 P.3d at 1138 (quotation omitted).

[¶36]  Our primary objective in interpreting statutes is to give effect to the legislature's intent.  *Delcon Partners LLC v. Dep't of Revenue*, 2019 WY 106, ¶ 9, 450 P.3d 682, 685 (Wyo. 2019) (citing *Matteis Co. v. Town of Jackson*, 2019 WY 78, ¶ 14, 444 P.3d 1268, 1273 (Wyo. 2019)).  The best evidence of the legislature's intent is the plain and ordinary meaning of the words used in the statute.  *Id.* (citations omitted).  "We therefore construe each statutory provision *in pari materia*, giving effect to every word, clause, and sentence according to their arrangement and connection."  *PacifiCorp, Inc. v. Dep't of Revenue*, 2017 WY 106, ¶ 10, 401 P.3d 905, 908 (Wyo. 2017) (quoting *Nicodemus v. Lampert*, 2014 WY 135, ¶ 13, 336 P.3d 671, 674 (Wyo. 2014)).

[¶37] These principles apply when interpreting a tax or revenue statute. *See E. Laramie Cnty. Solid Waste Disposal Dist. v. Bd. of Equalization*, 9 P.3d 268, 271 (Wyo. 2000) (stating when "construing a taxing or revenue statute," courts should consider "every word in the statute so as to make it harmonious and reasonable in its operation.") (citing *State v. Union Pacific R.R. Co.*, 823 P.2d 539, 541 (Wyo. 1992)). However, "[a]s a general rule, tax exemptions are given a strict interpretation against an assertion of a taxpayer and in favor of the taxing power." *Id.* (citing 3A Sutherland *Statutory Construction* § 66.09, at 42 (5th ed. 1992)); *see also PacifiCorp*, ¶ 11, 401 P.3d at 909 (same).

[¶38] We begin by reviewing the Board's construction of the statute. Because we find the Board's construction was not in accordance with law, we will conduct an independent interpretation of Wyo. Stat. Ann. § 39-15-105(a)(iii)(E) (2023). Finally, we will consider whether the Board's findings were supported by substantial evidence and apply the facts in the record to the law.

### A. The Board's interpretation omitted an operative term and impermissibly expanded the meaning of the statute.

[¶39] Wyoming statute enumerates each state sales tax exemption. *See* Wyo. Stat. Ann. § 39-15-105. Section 105(a)(iii)(E), in relevant part, provides:

> (iii) For the purpose of exempting sales of services and tangible personal property consumed in production, the following are exempt:
>
> ***
>
> (E) Sales of power or fuel to a person engaged in the transportation business when the same is consumed directly in generating motive power for actual transportation purposes, except [for certain circumstances not relevant in this appeal].

Wyo. Stat. Ann. § 39-15-105(a)(iii)(E) (2023).

[¶40] Neither party contends this language is ambiguous. Similarly, the Board did not identify an ambiguity in the statute. We agree — the language "engaged in the transportation business" is unambiguous on its face. When read in the context of Title 39, the phrase is not vague or subject to conflicting interpretations. *See State v. Bannon Energy Corp.,* 999 P.2d 1306, 1310 (Wyo. 2000) (concluding the statutes in questions were unambiguous when read in light of each other).

10

[¶41]  The Board started with the plain and ordinary meaning of two words in the statute:

> "Engage" means "to employ or involve oneself; to take part in; to embark on." *Engage, Black's Law Dictionary* 646 (10th ed. 2014).  "Business" means "a commercial enterprise carried on for profit; a particular occupation or employment habitually engaged in for livelihood or gain." *Business, Black's Law Dictionary* 239 (10th ed. 2014).  Combining those definitions, "engaged in the business of" requires a continuing effort to make a profit.

Both definitions accurately capture the meaning of these terms.  *See Skoric v. Park Cnty. Cir. Ct.*, 2023 WY 59A, ¶ 9, 532 P.3d 667, 670 (Wyo. 2023) (stating "[d]ictionary definitions may be used to determine the plain and ordinary meaning of statutory language").

[¶42]  The Board then diverged from the text in Wyo. Stat. Ann. § 39-15-105(a)(iii)(E) and proceeded with the following approach:

> Faced with a federal tax statute that used, but did not define, the phrase "attributable to a trade of [sic] business carried on by the taxpayer," the United States Supreme Court said: "We accept the fact that to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit." *Comm'r of Internal Revenue v. Groetzinger,* 480 U.S. 23, 35 107 S.Ct. 980, 987 (1987).

The Board's analysis came directly from a prior administrative ruling where it considered the meaning of the phrase "engaged in the business" as used in Wyo. Stat. Ann. § 39-15-101(a)(xv) (2015).  *See In re Appeal of Bd. of Johnson Cnty. Comm'rs*, 2018 WL 818126, *7, Docket No. 2017-42, ¶ 32 (Wyo. State Bd. of Equalization, Jan. 31, 2018).

[¶43] Finally, the Board concluded Merit is engaged in the *transportation* business, reasoning:

> Lacking a more relevant definition of "engaged in a trade of [sic] business," we will again rely on the one provided by the [United States] Supreme Court [in *Groetzinger*]: 1) "the taxpayer must be involved in the activity with continuity and regularity;" and 2) "the taxpayer's primary purpose for engaging in the activity must be for income or profit." That

11

definition is also consistent with the Department's reading, as testified to by Mr. Fanning. (*Supra* ¶ 6). Mr. Watson's uncontroverted testimony addressed both elements of that definition: he testified that Merit is [sic] continuously uses its pipeline to move oil owned by others, and charges the oil owners for that service.

[¶44] The Board concluded Merit is in the transportation business by applying the *Groetzinger* test, an approach designed to determine whether a taxpayer is generally "engaged in a trade or business" for the purposes of the federal Internal Revenue Code. *See Groetzinger*, 480 U.S. at 35 (stating a taxpayer "must be involved in the activity with continuity and regularity" and their primary purpose for engaging in the activity "must be for income or profit").

[¶45] The Board erred when it interpreted "engaged in the transportation business" for two reasons. First, the Board did not consider the meaning of "transportation" or incorporate the term into its analysis. Although it applied the ordinary meaning of "engage" and "business" to its interpretation, the Board gave no effect to "transportation" as situated in the text of the statute. The Board's omission contravenes a long-standing principle of statutory interpretation. *See Bolack v. Chevron, U.S.A., Inc.*, 963 P.2d 237 (Wyo. 1998) (stating "we read a statute so that every word, clause and sentence is given effect so, if possible, no part of the statute is rendered inoperative or superfluous.") (citations omitted).

[¶46] Second, the Board compounded its error when it applied the *Groetzinger* test. That test determines whether a taxpayer is "engaged in a trade or business." *Groetzinger*, 480 U.S. at 35. The statute at issue in this case, however, uses the specific phrase "engaged in the **transportation** business." Wyo. Stat. Ann. § 39-15-105(a)(iii)(E) (emphasis added). The question of whether Merit is "engaged in a trade or business" is a markedly broader question than whether it is "engaged in the transportation business." The failure to consider the term "transportation" effectively and impermissibly expands the meaning of the statute. *See Big Al's Towing and Recovery v. Dep't of Revenue*, 2022 WY 145, ¶ 31, 520 P.3d 97, 105 (Wyo. 2022) (recognizing tax statutes "should not be extended, by implication, beyond the clear import of the language used, or their operations enlarged to embrace matters not specifically addressed.").

[¶47] The Board's interpretation was not in accordance with law and must be set aside. *See In re Workers' Compensation Claim of Keck*, 985 P.2d 430, 433 (Wyo. 1999) (reversing agency interpretation of workers' compensation statute because it was not in accordance with law).

**B.** **The plain language of the statute must be read in its entirety and in harmony with Title 39.**

[¶48]  The Board properly considered the meaning of "engage" and "business," so we begin our analysis with the unexamined text in Wyo. Stat. Ann. § 39-15-105(a)(iii)(E) (2023).  Again, to give effect to the intent of the legislature, we consider "every word in the statute so as to make it harmonious and reasonable in its operation." *See Union Pacific R.R. Co.*, 823 P.2d at 541.  After we examine the meaning of "transportation" and its preceding definite article "the," we will consider the placement of the phrase "engaged in the transportation business" within the entire text of the statute.

[¶49]  This Court previously identified the ordinary meaning of "transportation" in the context of Title 39:  "As commonly used, to 'transport' is 'to transfer or convey from one place to another[.]'"  *WPX Energy Rocky Mountain, LLC v. Dep't of Revenue*, 2022 WY 104, ¶ 23, 516 P.3d 449, 455 (Wyo. 2022) (citing *Merriam-Webster's Collegiate Dictionary* 1330 (11th ed. 2014)).  We have also recognized that "transport" means "to convey from one place to another." *Id.* at ¶ 23, 516 P.3d at 455 (citing *Merriam-Webster Dictionary* 522 (2005)); *see also In re Worker's Compensation Claim of Barlow*, 2011 WY 120, ¶ 12, 259 P.3d 1170, 1175 (Wyo. 2011) (applying a similar definition of "transport").

[¶50]  But in this case, the nouns "transportation" and "business" in the statute are preceded by the word "the," which is significant because "the" is a "demonstrative adjective used chiefly before a noun to individualize, specialize, or generalize its meaning[.]" *McClanahan v. Woodward Const. Co.*, 316 P.2d 337, 341 (Wyo. 1957).  Because "the" qualifies the successive phrase "transportation business," we conclude "engaged in the transportation business" means an entity uniquely employed in the commercial enterprise of moving goods or products from one place to another. *See BP Am. Prod. Co. v. Madsen*, 2002 WY 135, ¶ 8, 53 P.3d 1088, 1091 (Wyo. 2002) (recognizing "the definite article 'the' is a word of limitation").

[¶51]  The Court must also interpret the phrase "engaged in the transportation business" within the context of the statute. *See Leal*, ¶ 14, 553 P.3d at 1186 (noting courts are guided by the full text of the statute "paying attention to its internal structure and the functional relation between the parts and the whole").  The statute provides an exemption for:

> Sales of power or fuel to a person engaged in the transportation business when the same is consumed directly in generating motive power for actual transportation purposes, except [for circumstances not relevant to this case].

Wyo. Stat. Ann. § 39-15-105(a)(iii)(E) (2023).  In plain language, exempted sales of power or fuel must be made to those "engaged in the transportation business," and the power or fuel must be "consumed directly in generating motive power for actual transportation

purposes." The terms "directly" and "actual" emphasize the exempted sales of power or fuel must *in fact* serve a transportation purpose. *See Merriam-Webster's Collegiate Dictionary* 13, 354 (11th ed. 2014) (defining "actual" as "existing in fact or reality" or "not false or apparent" and defining "directly" as "in a direct manner" or "without delay").

[¶52]   The Legislature did not enact the phrase "engaged in the transportation business" in isolation. When read in its entirety, the language in § 39-15-105(a)(iii)(E)(2023) requires us to also consider the purpose for the consumed power or fuel purchased. We find Merit must satisfy two conditions to qualify for the tax exemption: (1) the sales must go to a person engaged in the transportation business; and (2) the sales must be consumed directly in generating motive power for actual transportation purposes.

### C.      Merit is not engaged in the transportation business.

[¶53]   The Board concluded Merit is in the transportation business because its employee testified that "Merit is [sic] continuously uses its pipeline to move oil owned by others, and charges the oil owners for that service." Its conclusion was based on the Board's application of the *Groetzinger* test, which was an error of law. "We do not defer to the agency's ultimate factual finding if there is an error in either stating or applying the law." *Chevron U.S.A., Inc. v. Dep't of Revenue*, 2007 WY 79, ¶ 10, 158 P.3d 131, 134 (Wyo. 2007) (citations omitted).

[¶54]   The parties agree "Merit is engaged in oil and gas production in Wyoming." Nonetheless, they disagree on Merit's primary business, and to what extent the company's relationship with working interest owners is relevant for the purpose of the tax exemption.

### 1.      Merit is undisputably producing oil and gas.

[¶55]   The Department argues Merit's movement of crude oil from the wellhead to the LACT constitutes gathering, not transportation. The mineral severance tax statute defines "gathering" as "the transportation of crude oil, lease condensate or natural gas from multiple wells by separate and individual pipelines to a central point of accumulation, dehydration, compression, separation, heating and treating or storage." Wyo. Stat. Ann. § 39-14-201(a)(ix) (2025). But this definition only captures a portion of Merit's activities — the movement of crude oil from the wellhead to the "battery" or surface facilities where Merit separates produced water from the crude oil. At these surface facilities, Merit uses heater-treaters, separators, and knock-out tanks to separate the water from the crude oil. This is a necessary step in the production process because the LACT measures crude oil quality for marketing purposes. Therefore, the term "gathering" does not completely describe the activities at issue in this case because it leaves out Merit's water separation process and the movement of crude oil from the well site to the LACT.

[¶56]   Merit claims the definition of "well site" supports its position that the movement of crude oil between the wellhead and the LACT means the company is in the transportation business.  It maintains the company moves crude oil off the "well site" as defined by § 39-15-101(a)(xviii), and under this statutory definition, the Legislature "understood that the movement of oil from the wellhead to somewhere else is transportation."

[¶57]   Merit, however, abridged the definition of "well site" to suit its argument, insisting: "the Legislature defines 'well site' as 'an area where production equipment [such as a wellhead] is installed to store or prepare oil or gas **for transportation** off the well site.'" (alteration and emphasis by Merit).  The definition, in its entirety, provides:

> "Well site" means an area where production equipment is installed to store or prepare oil or gas for transportation off the well site.  Production equipment includes, but is not limited to, wellheads, valves, tanks, dehydrators, heater-treaters, separators, flow lines, meters, flares, vapor recovery units and emission equipment.  Except as provided in this paragraph, production equipment for purposes of defining a well site shall not include compressors, off well site gathering lines and processing facilities.

Wyo. Stat. Ann. § 39-15-101(a)(xviii) (2023).  Merit's omission is significant because it suggests the well site ends *at the wellhead*, consistent with Merit's argument that "the movement of oil from the wellhead to somewhere else is transportation."  But the statute is clear, a "well site" extends *beyond the wellhead* and includes other production equipment including tanks, heater-treaters, and knock-out vessels.  Therefore, it is incorrect to argue the Legislature intended the movement of crude oil from the wellhead to another location within the well site to constitute transportation.

[¶58]   Having addressed the statutory definition of "well site," we consider whether Merit is engaged in the transportation business in the context of the mineral severance tax statute.  The record includes the utility studies Merit commissioned to describe its production processes.  One such study provided the following summary of Merit's operations at its Spring Creek Field:

> The gathering pipelines collect the fluid produced by each individual well, and utilizing the excess pressure generated during artificial lift, transports it to a central point of accumulation at the battery where the oil and water are separated.  The battery contains free water knock out vessels, heater-treaters, oil accumulation tanks, water accumulation tanks, vapor recovery units, pumps, fans, and flares.

15

Each utility study uses a similar narrative to describe the Merit operations subject to this appeal.

[¶59]   The mineral severance tax statute describes when the "production process" for crude oil is complete.  Wyo. Stat. Ann. § 39-14-203(b)(iii) (2025); *see also PacifiCorp., Inc.*, ¶ 10, 401 P.3d at 908 (stating the Court also considers "all statutes relating to the same subject or having the same general purpose" in our effort to interpret them harmoniously). The crude oil production process ends "after extracting from the well, gathering, heating and treating, separating, injecting for enhanced recovery, and any other activity which occurs before the outlet of the initial storage facility or lease automatic custody transfer (LACT) unit." *Id*.  The term "production process" is broader than "gathering" and "well site" and more accurately describes the activities Merit performs at the battery.

[¶60]   Merit is not engaged in the transportation business when it moves fluids between the wellhead and the LACT.  The activity at issue in this appeal is best described as part of the crude oil production process, as defined in the mineral severance tax statute.  Wyo. Stat. Ann. § 39-14-203(b)(iii)(2025).

## 2.   The statute does not support the Department's primary business argument.

[¶61]   The Department argues that a person must "primarily" be engaged in the transportation business to qualify for the tax exemption.  The plain text of the statute does not require such exclusivity and the record discusses instances, not relevant here, where an oil and gas company is most likely engaged in the transportation business.[6]  There is no requirement that Merit must be "primarily" engaged in transportation to qualify for the exemption.

## 3.   Merit is reimbursed for its operating expenses; it is not paid to transport.

[¶62]   Merit maintains its relationship with working interest owners demonstrates it is engaged in the transportation business.  The company operates the wells in question for individuals with working interest ownership in each unit.  Merit's relationship with working interest owners is governed by various unit operating agreements. Based on these agreements, Merit argues it is in the transportation business because it "transport[s] oil it

---

[6] The record discusses Merit's midstream business segments outside of Wyoming which move large volumes of oil and gas through interstate pipelines.  Merit's midstream business activities are not at issue in this appeal but offer an example of how different segments of an oil and gas company might serve different functions.

does not own to a point of sale through a large transportation network designed to address the large volumes of water and get[s] paid by the working interest owners."[7]

[¶63]  The Board did not examine the unit operating agreements in the record.  Instead, it relied on a single piece of hearing testimony to conclude Merit is paid to move oil owned by others.  Such findings must be supported by substantial evidence in the record.  *See, e.g., Contango Res. LLC*, ¶ 24, 565 P.3d at 173-74 (applying the substantial evidence standard).  On review, we must "examine the entire record" to determine whether there is substantial evidence to support the agency's findings.  *Exaro Energy III v. Wyoming Oil & Gas Conservation Comm'n*, 2020 WY 8, ¶ 10, 455 P.3d 1243, 1248 (Wyo. 2020) (quoting *Dale v. S&S Builders, LLC*, 2008 WY 84, ¶ 11, 188 P.3d 554, 558 (Wyo. 2008)).

[¶64]  The unit operating agreements authorize Merit to operate each unit.  As the operator, Merit possesses the exclusive right to operate the unit, has a duty to exercise workmanlike conduct, and is responsible for managing expenses and accounting.  As Merit acknowledges, these agreements are not standalone transportation agreements.  The unit operating agreements do not discuss "transportation" or Merit's supposed responsibility for "moving oil" within the respective units.  The agreements incorporate several attachments, and when transportation is discussed, it is in the context of the operator's responsibility for transporting employees, surplus material, or tubular products.

[¶65]  Merit's argument that it only "gets paid to transport oil" is misleading.  The unit operating agreements state Merit is initially responsible for *all* operating expenses.  Merit then charges those operating expenses to a joint account.  The joint account allows the working interest owners to monitor expenses because each working interest owner is responsible for their respective portion of the operating expenses.  Although Merit purchased the electricity necessary to operate the units, those purchases were charged to the joint account and incurred by the working interest owners.

[¶66]  Under the unit operating agreements, Merit is compensated for its own expenses as the unit operator.  For example, the Oregon Basin agreement states the actual costs for the operator to perform its obligations as a unit operator "shall be kept separately" as a distinct expense shared by the working interest owners.  The Hamilton Dome agreement similarly allows Merit to charge working interest owners directly for employee salaries and wages the company uses to operate the wells.  In other words, Merit is compensated to operate the units, not to transport oil.

[¶67]  The Board's findings were not supported by substantial evidence.  The unit operating agreements demonstrate Merit is engaged in the enterprise of operating oil and

---

[7] The plain text of Wyo. Stat. Ann. § 39-15-105(a)(iii)(E) does not distinguish between entities transporting their own goods and entities transporting goods owned by another.  Consequently, Merit's contention about moving oil it does not own is not relevant to whether it is engaged in the transportation business.

17

gas wells in Wyoming. The record also shows the working interest owners reimburse Merit for the fuel and power expenses necessary to operate the unit. We conclude the company's contractual relationship with working interest owners does not demonstrate Merit is "engaged in the transportation business."

### D.     Merit purchased the electricity for production purposes.

[¶68]  The statute offers separate grounds to deny Merit's request for a sales tax refund. Specifically, it exempts purchased power if it is "consumed directly in generating motive power for actual transportation purposes." Wyo. Stat. Ann. § 39-15-105(a)(iii)(E) (2023). Even if we had concluded Merit was engaged in the transportation business, Merit's activities do not qualify for the exemption because the parties' stipulated facts and the record demonstrate the purchased power was consumed for production purposes.

[¶69]  We have already concluded Merit's activities resemble the crude oil production process described in the mineral tax statute. *See* Discussion at II.C.1. The production process includes extraction, gathering, separating, reinjection, and any other activity which occurs before the outlet of the initial storage facility or LACT. *See* Wyo. Stat. Ann. § 39-14-203(b)(iii). Using the crude oil production process as an anchor point, we must examine "the entire record" to determine the purpose for the consumed power Merit purchased. Because the Board did not apply the law correctly, this Court does not defer to the agency's conclusion. *In re Deromedi*, 2002 WY 69, ¶ 8, 45 P.3d 1150, 1153 (Wyo. 2002) (quoting *Laramie County Bd. of Equalization v. Wyo. State Bd. of Equalization*, 915 P.2d 1184, 1188 (Wyo. 1996)).

[¶70]  Merit seeks an exemption only for the electricity used after the production fluids reach the wellhead. The record, however, shows the overwhelming majority of this electricity powers the movement of produced fluids through the production process, including the separation and treatment stages of production. Across its units, Merit produces over 1,000,000 barrels of water daily to yield 15,000 barrels of crude oil. The fluid arriving at the wellhead is not marketable crude oil, it is a commingled stream requiring processing before custody transfer at the LACT. These activities occur within the well site and are integral to production, not transportation. *See* Wyo. Stat. Ann. § 39-15-101(a)(xviii) (defining "well site" to include separators, heater-treaters, and flow lines). The utility studies Merit commissioned confirm that eighty-five to ninety-five percent of the electricity the company claims is exempt powers lift systems (electric submersible pumps and pumpjacks). Surface transfer pumps — equipment that could arguably move *marketable crude oil* — consume less than one percent of the total electricity Merit claims is exempt.

[¶71]  This allocation is dispositive. The statute requires that electricity be "consumed directly in generating motive power for actual transportation purposes." Wyo. Stat. Ann. § 39-15-105(a)(iii)(E) (2023). Here, the purchased power is consumed to lift, gather,

separate, and treat produced fluids which are all steps the mineral severance tax statute defines as part of the crude oil production process. *See* Wyo. Stat. Ann. § 39-14-203(b)(iii) (2025). In short, transportation begins after the production process is complete.

[¶72] In the oil and gas context, we have acknowledged the difficult task of sorting out where the production process ends and where transportation begins. *See Exxon Mobile Corp. v. Dep't of Revenue*, 2009 WY 139, ¶ 12, 219 P.3d 128, 134 (Wyo. 2009) (stating "[i]t is not always clear, however, just where the production process is completed and other operations, such as transportation, are begun."); *see also Union Pac. Resources Co. v. State*, 839 P.2d 356, 361 (Wyo. 1992) (The legislature, oil and gas producers, and agencies "have struggled over the years to determine when the mining or production process is complete."). In this instance, however, the record is clear. Merit does not simply transport crude oil from the wellhead to the LACT — the company must separate out large volumes of produced water and prepare the crude oil for market.

[¶73] Substantial evidence shows Merit relied on the power it purchased to move fluids through the production process. Merit did not consume the electricity in question for transportation purposes; it consumed the electricity to prepare the crude oil for sale. Accordingly, the company is not entitled to a tax refund under Wyo. Stat. Ann. § 39-15-105(a)(iii)(E) (2023).

## CONCLUSION

[¶74] Collateral estoppel does not bar the issues presented in the Department's appeal. Merit produces crude oil, serves working interest owners contractually as the unit operator, and consumes the power it purchases to generate power for the crude oil production process. Therefore, Merit is not entitled to the sales tax refund because its activities are not exempt under Wyo. Stat. Ann. § 39-15-105(a)(iii)(E) (2023). We reverse the decision of the Wyoming State Board of Equalization.